[Cite as *Zacharias v. Ohio Atty. Gen.*, 2023-Ohio-3142.]

**IN THE COURT OF CLAIMS OF OHIO**

| | |
|---|---|
| JERRY ZACHARIAS | Case No. 2021-00141JD |
| Plaintiff | Judge Lisa L. Sadler |
| v. | <u>DECISION</u> |
| OHIO ATTORNEY GENERAL | |
| Defendant | |

{¶1} On April 17, 2023, Defendant filed a motion for summary judgment asserting that it is entitled to judgment as a matter of law because Plaintiff cannot establish his claim for age discrimination pursuant to the Age Discrimination in Employment Act of 1967 (ADEA) pursuant to 29 U.S.C. § 623-634. Pursuant to L.C.C.R. 4(D), the motion for summary judgment is now fully briefed and before the Court for a non-oral hearing. For the reasons stated below, the Court GRANTS Defendant's motion for summary judgment.

**BACKGROUND**

{¶2} In its motion, Defendant argues that Plaintiff failed to provide sufficient evidence to prove that Defendant would have rehired him "but for" his age. In support of its motion, Defendant submits: (1) Affidavit of Dwight Holcomb; (2) Affidavit of Meredith Rockwell; (3) Health Care Fraud Section, Medicaid Special Agent Interview Notes; (4) a February 5, 2021 letter from Defendant's Human Resources Department (HR) to Plaintiff tendering an offer of employment for a Medicaid Fraud Intake Officer in Defendant's Health Care Fraud Section; and (5) deposition transcripts and all exhibits provided therein for Jerry Zacharias, Louis Agosta, Daniel Ozbolt, Dwight Holcomb, Richard Hardy, and Lloyd Early. Defendant argues this evidence shows that no genuine issues of material fact remain for trial.

{¶3} In response, Plaintiff argues that triable issues of material fact exist regarding whether Defendant's proffered reasons for its failure to hire Plaintiff are pretext for age discrimination.  In support, Plaintiff submits: Jerry Zacharias' Resume; six Performance Evaluations for Jerry Zacharias from 2013-2018; interview evaluations (rater sheets)[1] for Jerry Zacharias' Advanced Training Coordinator/Advanced Training Instructor interview from Agosta, Ozbolt, and Hardy; Sarah Thomas' Advanced Training Instructor Job Application; January 14, 2021 emails between Jennifer Gates and Ozbolt; Dan Ozbolt's student evaluation of Jerry Zacharias' May 2019 Ballistics 411 Workshop; Matt Richwine's student evaluation of Jerry Zacharias' September 2018 Big Three Firearms Instructor Course; anonymous student evaluation of Jerry Zacharias' October 2018 Big Three Firearms Instructor Course; Hardy's rater sheets for the Advanced Training Coordinator/Advanced Training Instructor interviews with Josh Grusendorf and Micah Stoll; Hardy's rater sheet for the Advanced Training Coordinator/Advanced Training Instructor interviews with Scott Mann and Ryan Born; Hardy's rater sheets for Advanced Training Coordinator/Advanced Training Instructor interviews with Ron Davitt, Lucinda McConnell, Bill Norton, Sarah Shendy, and Derek Foote.

## STANDARD OF REVIEW

{¶4} Motions for summary judgment are reviewed under the standard set forth in Civ.R. 56(C), which states, in part:

> Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule.

---

[1] To remain consistent with the terminology used in the parties' briefs, the Court will refer to the interview evaluation sheets as "rater sheets" throughout this Decision.

"[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court which demonstrate the absence of a genuine issue of material fact on a material element of the nonmoving party's claim." *Dresher v. Burt*, 75 Ohio St.3d 280, 292, 662 N.E.2d 264 (1996).

{¶5} To meet this initial burden, the moving party must be able to point to evidentiary materials of the type listed in Civ.R. 56(C). *Id.* at 292-293. If the moving party meets its initial burden, the nonmoving party bears a reciprocal burden outlined in Civ.R. 56(E), which provides that "an adverse party may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."

{¶6} When considering the evidence, "[a]ny doubt must be resolved in favor of the non-moving party." *Pingue v. Hyslop*, 10th Dist. Franklin No. 01AP-1000, 2002-Ohio-2879, ¶ 15. It is well-established that granting summary judgment is not appropriate unless,

> construing the evidence most strongly in favor of the nonmoving party:
> (1) there is no genuine issue of material fact; (2) the moving party is entitled
> to judgment as a matter of law; and (3) reasonable minds can come to but
> one conclusion, that conclusion being adverse to the nonmoving party.

*Robinette v. Orthopedics, Inc.*, 10th Dist. Franklin No. 97AP-1299, 1999 Ohio App. LEXIS 2038, 7 (May 4, 1999).

**FACTS**

{¶7} Initially, the Court notes that, while the record before the Court is extensive, there are very few factual disputes present in this case. Nevertheless, the Court views the evidence in a light most favorable to Plaintiff and finds the following facts relevant to this Decision.

{¶8} Plaintiff, a former employee of Defendant, claims that Defendant unlawfully discriminated against him based upon his age in violation of the ADEA when it failed to

hire him for any one of six available positions to which he applied—two Advanced Training Instructor positions, two Advanced Training Coordinator positions, one Curriculum Design Specialist position, and one re-opened Advanced Training Coordinator position—and, instead, hired younger and less qualified individuals.[2]  Complaint, ¶¶ 2, 7, 58.  Plaintiff, who was 63 years old during the relevant times in this case, has spent the majority of his career in law enforcement throughout which he has acquired extensive training and experience.  *Id.* at ¶ 20; *see also* Zacharias Depo., p. 6-7, 30, Exh. 1.  Between 1993 and 2019, Plaintiff took well over 100 training courses, among them includes nearly 50 instructor training courses.  *See* Zacharias Depo., Exh. 1.

{¶9} From 1991 until 2008, Plaintiff was employed with Marion Police Department in various capacities, including patrol officer, warrant services, swat officer, firearms training, subject control training, and administration.  Complaint, ¶ 20.  During that time, Plaintiff was also a part-time basic academy instructor in firearms training and subject control at Marion Technical College from 1999 until 2007.  And in 2005, he worked for Military Professional Resources, Inc. as a tactics and firearms instructor.  *Id.*  From 2008 until 2020, Plaintiff had been a Law Enforcement Training Officer (LETO) at Defendant's Ohio Peace Officer Training Academy (OPOTA).  *Id.* at ¶ 2.

{¶10} Among its functions, OPOTA oversees training requirements, curriculum, and certification standards of peace officers and others in the Ohio law enforcement community, which includes "using latest research and recommended professional practices" to provide "instruction in basic, advanced, and technical subjects."  Dwight Holcomb Affidavit, ¶ 3; Meredith Rockwell Affidavit, ¶ 3.  To evaluate the level of instruction OPOTA offered, Defendant organized a team that included OPOTA's Executive Director, Dwight Holcomb, Defendant's Director of Professional Standards and

---

[2] Plaintiff also applied and was not extended an offer of employment for a Medicaid Special Agent position and a Director of Curriculum Development position, but he makes no claim that Defendant discriminated against him when it failed to hire him for those positions.  Complaint, ¶¶ 1, 19, 40, 51, 58; *see also* Plaintiff's Memorandum in Opposition, p. 8, fn. 1.  Accordingly, the Court will only discuss these positions as they become relevant to Plaintiff's asserted claims.

Education Policy for the Ohio Peace Officer Training Commission (OPOTC)[3], Richard Hardy, Defendant's Director of Law Enforcement Operations, Doug Dumolt, and Holcomb's direct supervisor, John Born. Holcomb Depo., p. 17-19; Hardy Depo., p. 20-21. As a result of that evaluation, Defendant reorganized OPOTA in May 2020 to enhance the quality of law enforcement training and instruction (OPOTA's reorganization) during which all the LETO positions were abolished and Defendant terminated all the individuals employed as LETOs, including Plaintiff. Zacharias Depo., p. 58-60; Rockwell Aff., ¶¶ 4-7; Holcomb Aff., ¶¶ 4-5; Hardy Depo, p. 20.

{¶11} Around the time of OPOTA's reorganization, Defendant's communication staff released a statement concerning OPOTA's "1960s-style training." Zacharias Depo., p. 149; Hardy Depo., p. 42. In an effort to transform OPOTA into "the example of law enforcement training for not only Ohio, but the nation", Defendant created five new positions: two Advanced Training Instructor for firearms (firearms training instructor) positions, two Advanced Training Coordinator (training coordinator) positions, and one Advanced Training Instructor for driving (driving training instructor)[4] position. Hardy Depo., p. 23; Rockwell Aff., ¶ 8. These new positions were designed to "reach out to professionals within Ohio's law enforcement, as well as the nation's law enforcement, to develop curriculum that was timely, current, acceptable to a national standard of practice, as well as enhancing and increasing the scope of subject matter experts who would help develop that." Hardy Depo., p. 24. Under the previous model prior to OPOTA's reorganization, many of the subject matter experts "were just internal peers coming up with lesson plans. The new path was to get persons who are active or had subject matter expertise in a field to develop a program * * * and format that and then offer that as a course through OPOTA." *Id.* at 24-25.

---

[3] OPOTA and OPOTC work together to fulfill the same operation for Defendant—OPOTA is the training side of the organization and OPOTC is the regulatory side of the organization. Holcomb Depo., p. 10; Hardy Depo., p. 20.

[4] Plaintiff did not apply for the advanced driving instructor position and, therefore, the Court will not discuss it.

{¶12} Specifically, the training coordinator was required, among other things, to (1) "[i]dentify, vet, and coordinate guest instructors and programs to facilitate in person and online training courses * * *."; (2) "work with internal staff, customer agencies, stakeholders, and other designated organizations to identify the current training needs of law enforcement and make recommendations to the Executive Director as to subject matter and courses that should be offered at OPOTA"; (3) "[u]tilize student feedback, surveys, and other tools to evaluate guest instructors, course content, subject matter, and deliver to ensure trainings meet the standards set forth by the Executive Director"; (4) "[a]ssist internal AGO subject matter experts, guest instructors, and instructional design specialist to develop in person and online training content, statutorily mandated course materials and trainings, or on topics as directed"; (5) "[a]ssist guest instructors, advanced training instructors, and other designated individuals presenting academic content, managing physical or virtual classroom, conducting assessments, utilizing OPOTA equipment and facilities, and evaluating students, as needed or directed"; and (6) "[f]ill in as needed during the unforeseen or preplanned absence of an advance training instructor or guest instructor." *See, e.g.,* Agosta Depo., Exh. 22, OAG000461.

{¶13} Specifically, the training instructor was required, among other things, to (1) "[d]evelop, organize, coordinate, implement, and instruct advanced law enforcement training course and programs, both in person and online, in field(s) of responsibility"; (2) "[m]aintain and demonstrate subject matter expertise in field(s) of responsibility"; (3) "[m]anage in person and virtual classroom environments, lead learning activities, develop and conduct student assessments, evaluate student performance for certification, record and maintain assessment results and records, and ensure all training courses are conducted in compliance with applicable codes, in field(s) of responsibility"; (4) "develop and prepare audio visual needs, schedules and arranges use of training facilities, coordinates training needs with outside agencies, evaluates long term training needs, researches learning theory, and may work with Advanced Training Coordinator(s) to locate, contact & negotiate salaries for guest instructors"; (5) "[i]dentify external subject matter experts * * *"; (6) "[d]emonstrate and maintain proficiency [in the] use of audio/visual equipment and online training platforms used by OPOTA"; (7) "[r]ecommend

inclusion of additional courses, programs, and certifications * * *"; and (8) "[e]valuate needs and make recommendations as to the equipment, resources, [and] supplies * * * needed to conduct advanced training * * *." *See, e.g.,* Agosta Depo., Exh. 23, OAG000455.

### *Defendant's Hiring for Advanced Training Instructor and Coordinator Positions*

{¶14} All formerly employed LETOs were invited to apply to these new positions. Rockwell Aff., ¶ 9. Plaintiff deponed that he had no knowledge of how Defendant decided to restructure the requirements for the new positions compared to the former qualifications needed prior to OPOTA's reorganization. Zacharias Depo., p. 94-97. HR reviewed the applications and compiled a list of candidates that met the minimum qualifications to be interviewed. Ozbolt Depo., p. 151-154. Any internal employee who applied for these new positions was given an interview. Holcomb Depo., p. 47-48. All candidates, whether they applied for one or multiple of the positions, received only one interview. Holcomb Aff., ¶ 12. Defendant selected three directors to comprise a hiring committee to conduct the necessary interviews and recommend candidates to HR. *Id.* at ¶¶ 9, 15.

{¶15} While it was HR who received the hiring committees' recommendations and formally communicated the offers of employment, OPOTA's former Director of Advanced Training, Daniel Ozbolt, was the final decision maker as to who was hired because the five new positions were organized under his supervision. *Id.* at ¶ 15; Holcomb Depo., p. 27, 32, 46, 48; Ozbolt Depo., 75-76. At the time of the interviews, Ozbolt was approximately 61 years old. Holcomb Aff., ¶ 9; Ozbolt Depo., p. 48-49. Prior to OPOTA's reorganization, Ozbolt was employed with Defendant as a LETO and was Plaintiff's coworker at OPOTA. Zacharias Depo., p. 39, 102; Ozbolt Depo., p. 24-25. Soon before OPOTA's reorganization occurred, Ozbolt was promoted to OPOTA's Director of Advanced Training. Ozbolt Depo., p. 43.

{¶16} To assist Ozbolt with conducting interviews and recommending candidates to HR, Louis Agosta and Richard Hardy were also on the hiring committee. Holcomb Aff., ¶ 9; *see also* Plaintiff's Memorandum in Opposition, p. 15. Agosta, OPOTA's

Accreditation Manager, was 63 years old during the relevant times in this case. Holcomb Aff., ¶ 9. Agosta was Plaintiff's immediate supervisor at OPOTA's tactical training center from 2008, when Plaintiff was hired as a LETO, until June 2019, when Agosta was transferred to be OPOTA's Accreditation Manager. Agosta Depo., p. 13-14, 21. Richard Hardy, OPOTA's Assistant Executive Director, was 58 years old during relevant times in this case. Holcomb Aff., ¶ 9. At the time of the interviews, Hardy was OPOTC's Director of Professional Standards and Education Policy. Hardy Depo., p. 10-11. Hardy did not have much contact with Plaintiff in his capacity as the Director of Professional Standards and Education Policy; however, Plaintiff was once one of his instructors at OPOTA when Hardy was a student obtaining firearms instructor certifications in 2011. Hardy Depo., p. 14-16.

{¶17} To aid in conducting the interviews, HR provided the hiring committee with rater sheets, which required each interviewer evaluate the candidates on several objective criteria relevant to the position: professionalism, communication, attentiveness, customer service/interpersonal skills, computer experience, education/training, experience related to the position, knowledge of position and AGO, and work history/dependability. *See, e.g,* Zacharias Depo., Exh. 5, OAG000934, OAG000934, OAG00936; Holcomb Aff., ¶ 11. Each member on the hiring committee independently completed his own rater sheet on which he assigned a score between one and five for each of these categories. *Id.* These scores were based on the interviewers' subjective assessment of the applicant's delivery and performance during the interview, the information provided in the application, and any prior knowledge of or experience with the applicant. Hardy Depo., p. 85; Agosta Depo., 111, 127-128. Thereafter, each of the scores were combined for an overall score that was averaged. Agosta Depo., p. 111-112.

{¶18} For professionalism, candidates could score: 1 if they were "[n]ervous, uneasy, wary and uncomfortable"; 2 if they were "[h]esitant, displayed discomfort occasionally"; 3 if they were "[a] little tense, but overall relaxed and poised"; 4 if they were "[r]elaxed and confident; comfortable in interview; inquisitive"; or 5 if they were "[v]ery poised and in control; handled the interview extremely well". *See, e.g,* Zacharias Depo., Exh. 5, OAG000934.

{¶19} For communication, candidates could score: 1 if they "[c]ommunicated thoughts poorly; spoke only when spoken to"; 2 if they "[c]ommunicated freely, but could not organize thoughts clearly"; 3 if they "[c]ommunicated well enough to have a mutual conversation"; 4 if they "[c]ommunicated well; had focused thoughts"; or 5 if they "[c]ommunicated extremely well, directly and intelligibly; asked pertinent questions". *See, e.g,* Zacharias Depo., Exh. 5, OAG-000934.

{¶20} For attentiveness, candidates could score: 1 if their "[a]ttention wandered; indifferent; apathetic"; 2 if they had "[s]hort attention span. Reason(s) for interest in position is questionable"; 3 if they were "[a]ttentive and understood with no major problems"; 4 if they were "[v]ery attentive and engaged; quick to understand"; or 5 if they were "[e]xtremely attentive and anticipated course of interview; alert". *See, e.g,* Zacharias Depo., Exh. 5, OAG000934.

{¶21} For customer service/interpersonal skills, candidates could score: 1 if they "[h]a[d] no experience or skills working with clients and/or customers"; 2 if they "[h]a[d] limited experience working with clients and/or customers"; 3 if they "[h]a[d] adequate experience in working with clients and/or customers"; 4 if they "[h]a[d] knowledge and experience of how to work with clients and/or customers with limited guidance"; or 5 if they "know[] how to work with clients and/or customers with no guidance". *See, e.g,* Zacharias Depo., Exh. 5, OAG000935.

{¶22} For computer experience, candidates could score: 1 if they had "[n]o computer knowledge/experience"; 2 if they had "[v]ery little computer knowledge/experience"; 3 if they "meet[] minimum requirements"; 4 if they had "good computer knowledge/experience"; or 5 if they had "[e]xcellent computer knowledge/experience". *See, e.g,* Zacharias Depo., Exh. 5, OAG000935.

{¶23} For education/training, candidates could score: 1 if they had "[n]o education or trainings that is relevant to this position"; 2 if they have "had a few courses or seminars on related subjects and has limited working knowledge of position"; 3 if they "meet[] the minimum educational/training requirements and has some working knowledge of position"; 4 if they have "had specific educational background and/or training for the

position"; or 5 if they were "[e]xtremely well trained for this position because of educational background". *See, e.g,* Zacharias Depo., Exh. 5, OAG000935.

{¶24} For experience related to the position, candidates could score: 1 if they had "[n]o experience related to the position applied for"; 2 if they had "[s]ome experience that relates to the position applied for. Will need a great deal of training"; 3 if their "[e]xperience is relevant and adequate for this position"; 4 if they had "[g]ood experience that is directly related to the position applied for"; or 5 if they had a "[g]reat deal of experience that is directly related to the position applied for. No training needed". *See, e.g,* Zacharias Depo., Exh. 5, OAG000935.

{¶25} For knowledge of position and AGO, candidates could score: 1 if they had "[p]oor or no knowledge of position/AGO"; 2 if they "[h]a[d] some or very little knowledge of position/AGO"; 3 if they "[h]a[d] adequate knowledge of the position/AGO"; 4 if they "kn[ew] a good deal about position and/or requirements and AGO"; or 5 if they had [e]xcellent knowledge of all aspects of this position and AGO". *See, e.g,* Zacharias Depo., Exh. 5, OAG000936.

{¶26} For work history/dependability, candidates could score: 1 if they had "[u]nstable work history, lacks motivation, resistant to change, rigid"; 2 if they were "[s]omewhat motivated but failed to exhibit dependability or initiative"; 3 if they "[met] minimum standard qualities or a good work ethic"; 4 if they were "[m]otivated, cooperative, dependable, lacks initiative"; or 5 if they were "[a] highly motivated worker. Proven ability to be dependable, loyal and team player". *See, e.g,* Zacharias Depo., Exh. 5, OAG000936.

{¶27} In May 2020, Plaintiff applied for the firearms training instructor and training coordinator positions. Holcomb Aff., ¶ 8. Plaintiff's interview for both positions took place on June 8, 2020. Zacharias Depo., Exh. 5, OAG000934. Later that month, HR informed Plaintiff that he was not selected for either position. Complaint, ¶ 22; Holcomb Aff., ¶ 19.

{¶28} Plaintiff's total scores given by the hiring committee members ranged from 33-35. For a total score of 34, Ozbolt scored Plaintiff as follows: 3 on professionalism; 3 on communication; 3 on attentiveness; 3 on customer service/interpersonal skills; 2 on computer experience; 5 for education/training; 5 on experience related to the position;

5 on knowledge of position and AGO; and 5 on work history/dependability. Zacharias Depo., Exh. 5, OAG000934, OAG000934, OAG00936. For a total score of 33, Agosta scored Plaintiff as follows: 3 on professionalism; 4 on communication; 3 on attentiveness; 3 on customer service/interpersonal skills; 3 on computer experience; 4 for education/training; 5 on experience related to the position; 4 on knowledge of position and AGO; and 4 on work history/dependability. Zacharias Depo., Exh. 5, OAG000938, OAG000939, OAG00940. For an overall score of 35, Hardy scored Plaintiff as follows: 4 on professionalism; 4 on communication; 4 on attentiveness; 4 on customer service/interpersonal skills; 3 on computer experience; 4 for education/training; 4 on experience related to the position; 4 on knowledge of position and AGO; and 4 on work history/dependability. Zacharias Depo., Exh. 5, OAG000950, OAG000951, OAG00952. After the hiring committee member's individual total scores were combined and divided, Plaintiff's calculated overall average score was 7.52. Holcomb Aff., ¶ 14; Agosta Depo., p. 111-112.

{¶29} Aside from Plaintiff's performance during the interview, everyone on the hiring committee agreed that Plaintiff had an extensive amount of training and knowledge of firearms. Hardy Depo, p. 74; Ozbolt Depo., p. 160-161; Agosta Depo., p. 17-18. Ozbolt, specifically, explained that none of the other candidates possessed the same level of training and knowledge as Plaintiff. Ozbolt Depo., p. 95. Additionally, there is no dispute that Plaintiff had various strengths as a LETO. *See* Zacharias Depo., p. 45-46 ("Like if I needed help and they assigned me one of the other ancillary instructors, we all have strengths and weaknesses, and so there would be discussions about that."); Agosta Depo., p. 92-93 ("he wasn't the best, he wasn't the worst. He was a good employee. He had some very strong points, and he has some weaknesses as we all do."); Ozbolt Depo., p. 34-37, 53-57, 86-87 ("I think Jerry is great on paper and again, I really value experience. To me that is huge in our profession because it gives you credibility. But again, you have got to be able to convey the message."). However, the hiring committee collectively felt that other candidates demonstrated a better ability to instruct and relay the necessary knowledge or training to a class of students who ranged in skill level. *Id.* at 86-87, 95, 50-51, 54-55, 196 ("he wasn't always bad. He wasn't always all over the place. You know,

I don't want to mischaracterize Jerry, but, you know, overall, he just wasn't as good of a communicator as the other[s].”); Hardy Depo., p. 105; Agosta Depo., p. 152.

{¶30} Each member of the hiring committee had separate experiences seeing Plaintiff instruct and concluded that Plaintiff was not among the best instructors available to fill one of the newly created positions.  Ozbolt Depo., p. 36-38 (“He was hard to follow. He would sometimes get more technical than you needed to be.  Because he was very knowledgeable about how a firearm functioned and the mechanics behind it and the engineering and all the aspects that go into a firearm, he was very, very knowledgeable. But sometimes he'd get * * * caught up in the weeds a little bit too much instead of instructing and focusing on what the students need to know to become better shooters.”); Agosta Depo., p. 69-70 (“he had a hard time transferring his knowledge from himself to the students which confused the students quite often”); Hardy Depo., p. 13 (“the course was challenging in that he sometimes would go off topic. And when police officers tend to get around other police officers, they tend to tell a lot of war stories of their experiences, and some of those were just outside the scope of the firearms instructor training that we were there to receive.”).   While Plaintiff received positive feedback from students regarding his instructing in some of the courses he taught as a LETO, it does not appear that the hiring committee reviewed prior student evaluations as a part of the interview process for the new positions.  *See, e.g.,* Ozbolt Depo., Exhs. 54-55, 59-60; *but see* Agosta Depo., p. 136, 188; Ozbolt Depo., p. 110-111; Hardy Depo., p. 52, 78-79. Additionally, the hiring committee felt other candidates demonstrated a stronger ability to develop lesson plans and had more experience using the technology necessary to transition to an online format.  Agosta Depo., p. 67, 153; Hardy Depo., p. 98-9; Ozbolt Depo., p. 49, 62, 167, 195-196.  Plaintiff also acknowledged that “there would be a learning curve and that [he] would be working with computer programs maybe [he] had not seen before * * *.”  Zacharias Depo., p. 88.

{¶31} There were also times when Plaintiff's behavior at work was perceived as less than professional.  *See, e.g.,* Ozbolt Depo., p. 11, 36, 109-110 (“I would be assisting another instructor with a class and it would be a pistol class and in the middle of the class he would walk onto the range, hold the shotgun with a fluorescent greenish yellow hat on

with his pants kind of hiked up high and he would be a little bit of an interruption and disruption to the class."). Lloyd Early, Special Agent in Charge of Defendant's Health Care Fraud Section, was instructed by Plaintiff on a quarterly basis for firearms training provided to the health care fraud agents and specifically opined: "I think it's also fair to say that Jerry was sort of * * * the class clown of the group if you will. * * * I think there were times that Jerry used language that was borderline inappropriate, maybe borderline off color." Early Depo., p. 10-11, 21-22.

{¶32} With respect to the first firearms training instructor position, Aaron Coey, who was 38 years old at the time, received the highest overall average interview score of 9.75 and Defendant extended him an offer of employment that he accepted. Holcomb Aff., ¶ 16-17. Hardy, specifically, "felt that he was the type of instructor that we needed in the reorganization." Hardy Depo., p. 110. Based on his interview performance, Hardy gave Coey an overall interview score of 43, scoring him as follows: 5 on professionalism; 5 on communication; 4 on attentiveness; 5 on customer service/interpersonal skills; 4 on computer experience; 5 for education/training; 5 on experience related to the position; 5 on knowledge of position and AGO; and 5 on work history/dependability. Hardy Depo., Exh. 28, OAG000987, OAG000988, OAG00989.[5] Moreover, Ozbolt thought "he brought a lot to the table in that he was multi-faceted and that he could teach subject control. He could teach firearms. He could teach force instructor and I had seen him teach on numerous occasions. He was very, very good. He had a good presence and a good way about him." Ozbolt Depo., p. 80-81. Additionally, Plaintiff himself deposed that Aaron Coey had proven himself to be a qualified instructor. Zacharias Depo., p. 61.

{¶33} For the second firearms training instructor opening, Michael Torres, who was 39 years old at the time, received an overall average interview score of 7.77 and Defendant extended him an offer of employment that he accepted. Holcomb Aff., ¶ 18. Before extending an offer to Torres, Defendant previously extended two other offers to candidates with higher interview scores, both of whom declined to accept the position. *Id.* at ¶ 16-17. Not only was Torres the next highest-ranking candidate in terms of overall

---

[5] Ozbolt and Agosta's individual rater sheets for Coey were not submitted into evidence.

average interview score, Ozbolt felt he was "the next best viable candidate who could communicate." Ozbolt Depo., p. 94. After observing both of them instruct, Ozbolt felt Torres could "convey the message" better than Plaintiff because Torres "conveyed the message in a logical order and logical fashion and [was] fairly easy to understand." *Id.* at 95.

{¶34} Torres' total scores given by the hiring committee members ranged from 32-37. For a total score of 37, Ozbolt scored Torres as follows: 4 on professionalism; 4 on communication; 5 on attentiveness; 3 on customer service/interpersonal skills; 4 on computer experience; 5 for education/training; 3 on experience related to the position; 4 on knowledge of position and AGO; and 5 on work history/dependability. Ozbolt Depo., Exh. 50, OAG000930, OAG000931, OAG00932. For a total score of 36, Agosta scored Torres as follows: 4 on professionalism; 4 on communication; 4 on attentiveness; 4 on customer service/interpersonal skills; 4 on computer experience; 4 for education/training; 4 on experience related to the position; 4 on knowledge of position and AGO; and 4 on work history/dependability. Agosta Depo., Exh. 20, OAG000942, OAG000943, OAG00944. For an overall score of 32, Hardy scored Torres as follows: 4 on professionalism; 3 on communication; 4 on attentiveness; 4 on customer service/interpersonal skills; 3 on computer experience; 4 for education/training; 3 on experience related to the position; 3 on knowledge of position and AGO; and 4 on work history/dependability. Hardy Depo., Exh. 28, OAG000954, OAG000955, OAG00956.

{¶35} With respect to the first training coordinator position, Joshua Grusendorf, who was 40 years old at the time, received the highest overall average interview score of 9.29 and Defendant extended him an offer of employment that he accepted. Holcomb Aff., ¶ 19. In addition to his overall average interview score, Ozbolt felt Grusendorf was the best fit for this position because he had experience in crime scene, photography, and social media, "so he would be able to not only coordinate, but he would be able to teach and help teach" the more "science-related" courses. Ozbolt Depo., p. 117-119. Moreover, Ozbolt had also seen him instruct and felt he was an effective communicator. *Id.* at 118. Plaintiff acknowledged he has no basis to challenge that Grusendorf was qualified for this position. Zacharias Depo, p.97.

{¶36} Grusendorf's total scores given by the hiring committee members ranged from 40-44.  For a total score of 44, Ozbolt scored Grusendorf as follows: 5 on professionalism; 5 on communication; 4 on attentiveness; 5 on customer service/interpersonal skills; 5 on computer experience; 5 for education/training; 5 on experience related to the position; 5 on knowledge of position and AGO; and 5 on work history/dependability.  Ozbolt Depo., Exh. 50, OAG000881, OAG000882, OAG00883.  For a total score of 42, Agosta scored Grusendorf as follows: 5 on professionalism; 5 on communication; 4 on attentiveness; 4 on customer service/interpersonal skills; 5 on computer experience; 5 for education/training; 5 on experience related to the position; 4 on knowledge of position and AGO; and 5 on work history/dependability.  Agosta Depo., Exh. 20, OAG000893, OAG000894, OAG00894.  For an overall score of 40, Hardy scored Grusendorf as follows: 5 on professionalism; 5 on communication; 4 on attentiveness; 4 on customer service/interpersonal skills; 5 on computer experience; 4 for education/training; 4 on experience related to the position; 4 on knowledge of position and AGO; and 5 on work history/dependability.  Hardy Depo., Exh. 27, OAG000909, OAG000910, OAG00911.

{¶37} For the second training coordinator opening, Micah Stoll, who was 42 years old at the time, received an overall average interview score of 8.61 and Defendant extended him an offer of employment that he accepted.  Holcomb Aff., ¶ 19.  In addition to his overall average interview score, Ozbolt felt Stoll was the best fit for this position because he was "very effective at subject control instructing and he was a firearms instructor.  So he brought a lot to the table in that he had a diversified background as an instructor in that he could teach subject control * * * [b]ut he also had firearms experience."  Moreover, Ozbolt "had seen him teach on numerous occasions and he was a very effective communicator" who could "[e]xplain[] things in a logical manner", as well as being "very organized" and a "[r]eally hard worker."  Ozbolt Depo., p. 117,119.  Plaintiff acknowledged he has no basis to challenge that Stoll was qualified for this position. Zacharias Depo, p. 97.

{¶38} Stoll's total scores given by the hiring committee members ranged from 34-44.  For a total score of 44, Ozbolt scored Stoll as follows: 5 on professionalism; 5 on

communication; 5 on attentiveness; 5 on customer service/interpersonal skills; 4 on computer experience; 5 for education/training; 5 on experience related to the position; 5 on knowledge of position and AGO; and 5 on work history/dependability. Ozbolt Depo., Exh. 50, OAG000889, OAG000890, OAG00891. For a total score of 39, Agosta scored Stoll as follows: 4 on professionalism; 4 on communication; 4 on attentiveness; 4 on customer service/interpersonal skills; 4 on computer experience; 5 for education/training; 5 on experience related to the position; 5 on knowledge of position and AGO; and 4 on work history/dependability. Agosta Depo., Exh. 20, OAG000901, OAG000902, OAG00903. For an overall score of 34, Hardy scored Stoll as follows: 4 on professionalism; 4 on communication; 4 on attentiveness; 4 on customer service/interpersonal skills; 3 on computer experience; 4 for education/training; 4 on experience related to the position; 3 on knowledge of position and AGO; and 4 on work history/dependability. Hardy Depo., Exh. 27, OAG000917, OAG000918, OAG00919.

{¶39} While Ozbolt made the final hiring recommendation to HR and it was informally understood that he could override the hiring recommendations of Agosta and Hardy, all three directors on the hiring committee nevertheless agreed on which individuals were best to receive the initial offers of employment. Ozbolt Depo., p. 75-76; Hardy Depo., p. 50, 105-106, 119-120; Agosta Depo., p. 118; Holcomb Depo., p. 24, 26-27. Even though each candidate may have received differing scores across each separate interviewers' assessment of them on the objective interview criteria, the ranked scores—once combined and averaged—for each candidate also coincided with who the hiring committee felt were the top candidates to fill the new positions. Hardy Depo., 113-115, 119; Agosta Depo., p. 112, 145-152; Ozbolt Depo., p. 61-78. Regarding the qualifications of the selected candidates, Plaintiff believes he was more qualified because he has more years of service and has undergone more training than Coey, Torres, Grusendorf, and Stoll. Zacharias Depo., p. 159-163.

### Defendant's Hiring for Curriculum Design Specialist Position

{¶40} After Plaintiff was not selected for any of the firearms training instructor positions or training coordinator positions, Plaintiff applied for an open Curriculum Design

Specialist position in June 2020. Holcomb Aff., ¶ 21. Specifically, the curriculum design specialist position involved "work[ing] directly with the basic lesson plans of the various academies under the control of the Ohio Peace Officer Training Commission." The position required (1) "a person with instructional experience as well as the knowledge and skills to research, manage, revise, develop, and deliver training related to the academies"; (2) "an individual that is highly motivated, can lead team projects, and multi-task"; and (3) "the ability to coordinate courses in other disciplines." Hardy Depo., p. 133, Exh. 34. Plaintiff was interviewed for this position on July 7, 2020. *Id.*

{¶41} For this position, there was no hiring committee; Hardy alone conducted the interviews and ultimately selected the candidate to fill the Curriculum Design Position. Holcomb Aff., ¶ 22. During the interviews, Hardy followed a standard form, asking each candidate the same questions and then assigning an overall score. *Id.* at ¶ 23. In addition to the interview, candidates were required to complete a "Curriculum Design Specialist Writing Assessment" (writing assessment) and a "Curriculum Design Specialist Spelling, Punctuation, and Grammar Assessment" (spelling, punctuation, and grammar assessment) as a part of the application for this position. *Id.* at ¶ 24; *see also* Hardy Depo., p. 129. Plaintiff received a zero on the writing assessment and a minus seventeen on the spelling, punctuation, and grammar assessment. *Id.*; Zacharias Depo., Exhs. 7-9. Plaintiff deponed that he has no basis to refute the accuracy of his interview scores for this position. Zacharias Depo., p. 123-124. To the contrary, Plaintiff acknowledges that he "may not have performed well on the interview questions or the assessment * * *." *Id.* at 126.

{¶42} After conducting his interview and evaluating his assessments, Hardy "did not feel that [Plaintiff] was the candidate that we needed to be in this position moving forward without an extensive amount of training" and there was another candidate "who better performed." Hardy Depo., p. 129. Ultimately, Defendant did not tender an offer of employment to Plaintiff for the Curriculum Design position. Holcomb Aff., ¶ 25. Instead, Hardy recommended that Defendant hire Brenda Jill Cury because she:

> has been a Certification Officer for many years, has strong working knowledge of the position and interaction with all aspects of the OPOTC.

> Her submitted assessment documents show her commitment to the position, her strong writing skills, her research and organizational skills, and that she will add value to a critical statutorily mandated function of the OPOTC.

Hardy Depo., p. 132, Exh. 37, OAG001243-OAG001244. More specifically, Cury received a perfect score on the writing assessment and Hardy believed that Cury "would hit the ground running and be successful" in this position. *Id.* at 130; Holcomb Aff., ¶ 26. Cury, who was approximately 57 years old at the time, accepted the position. Holcomb Aff., ¶ 26. Additionally, Plaintiff acknowledges that he has no reason to dispute Cury's qualifications for this position. Zacharias Depo., p. 129. Moreover, Plaintiff deponed that he has no fact or reason to believe that he was not given the Curriculum Design Position because of his age. *Id.* at 128.

### *Retirement Comments*

{¶43} Sometime in August 2020 after the interviews for the firearms training instructor and training coordinator positions were conducted and Plaintiff did not receive an offer, Plaintiff went to Defendant's tactical training center to qualify with Madison County Sheriff's Office. *Id.* at 101, 110. While there, Ozbolt initiated a conversation with Plaintiff during which Ozbolt expressed that "he thought [Plaintiff] would already be down in Florida." *Id.* At some point during the conversation, Holcomb joined the discussion and stated, "this is my third retirement job. It's nothing to be afraid of * * * it's kind of a sweet deal." *Id.* at 103. It is undisputed that Ozbolt and Holcomb had previously retired and returned to employment following retirement. Ozbolt Depo., p. 14, 41; Holcomb Depo., p. 9.

{¶44} It is also undisputed that when Plaintiff and Ozbolt were coworkers prior to OPOTA's reorganization, they discussed retirement. Ozbolt Depo., p. 38; Zacharias Depo., p. 102, 110-111. Ozbolt specifically remembers that, during the cold months, he would joke that Plaintiff could retire to Florida and be with his family in the warm weather. Ozbolt Depo., p. 38. However, he does not recall any such conversation taking place at

the time that Plaintiff was interviewing for the new positions after the reorganization of OPOTA.[6]  *Id.* at 39-40.

{**¶45**} Additionally, Ozbolt denies that any conversation about retirement would involve a negative connotation about age because he "really values experience in law enforcement training" and "with experience comes age."  *Id.* at 40-41. According to Ozbolt, it is common amongst people in law enforcement to have conversations about retirement eligibility and their plans as they approach retirement.  *Id.* at 41-42; *see also* Zacharias Depo., p. 104, 111-112.  Similarly, Holcomb does not recall ever speaking with Plaintiff regarding his retirement or pension; however, he acknowledges that casual conversations regarding retirement often take place between coworkers close to retirement.  Holcomb Depo., p. 24-26.

{**¶46**} Concerning Agosta, Plaintiff states that Agosta initiated conversations about retirement on at least three occasions.  Zacharias Depo., p. 104.  On one such occasion, Agosta expressed that "he planned on reaching 30 years of service" during a conversation in the hallway to which Plaintiff explained he'd "like to work at least till [his] 30-year mark * * * at least."  *Id.* at 104-105.  Plaintiff does not provide an exact timeframe for when this particular conversation took place.  *See id.* at 103-105.

{**¶47**} On another occasion, which occurred when Plaintiff came to pick up his belongings after OPOTA's reorganization, Agosta again stated to Plaintiff "you can always retire and go to Florida."  *Id.* at 102.  After Plaintiff explained that would not be his plan, Agosta said "well, I plan on hanging around another three years."  *Id.*  On a third occasion in January 2021, Agosta said to Plaintiff, "well, heck, you can always go to Florida and retire to Florida and be near your sister."  *Id.* at 104, 112-113; Complaint, ¶ 52.  Agosta also recalls such a conversation, remembering: "I thought, oh, you'd be moving to Florida by now" because, based on his prior conversations with Plaintiff, he "assum[ed] after this particular layoff or whatever that he would want to move to Florida to be close to [his family]."  Agosta Depo., p. 96-97.

---

[6] This is consistent with Plaintiff's account that no age-related comments, about retirement or otherwise, were made during the interview process. Zacharias Depo., p.103, 106-108.

{¶48} Although Plaintiff did not initiate the conversation, he acknowledges that Agosta posited these comments as possible options for the future. Zacharias Depo., p. 108-109. It is also undisputed that Plaintiff shared with his coworkers that his sister, among other family members, lived in Florida. *Id.* at 107; Ozbolt Depo., p. 38; Agosta Depo., p. 97. While Plaintiff acknowledges that Agosta neither stated Plaintiff should retire nor otherwise made negative comments about his age, Plaintiff perceived these comments about retirement being made to him "as a negative that perhaps [he] was ready for retirement because of how [Agosta] valued [his] worth to the agency or the value of [his] work." Zacharias Depo., p. 107-108.

{¶49} Notwithstanding these conversations, Plaintiff acknowledges that his age or potential retirement plans were not mentioned by anyone on the panel during the interviews for the firearms training instructor and training coordinator positions. *Id.* at 77, 89, 101-113. Hardy, specifically, never asked Plaintiff about retirement or made any other comments concerning Plaintiff's age at any time, neither during the interview nor otherwise. *Id.* at 101, 125; Hardy Depo., p. 28, 95. With respect to the comments and scores made on the rating sheets regarding Plaintiff's interview performance, Plaintiff deponed that he has no basis to believe his age was a factor in the evaluation except that he felt he was the most qualified candidate and he was not hired but younger individuals were hired. Zacharias Depo., p. 76-77, 81. When explaining why he believes that the hiring committee scored him a particular way during the interview process for these positions, Plaintiff states:

> I'm sure that they had discussions with themselves, and I believe that maybe some people were – who didn't have experience with me would ask somebody who did have experience with me and take their guidance. Okay. I think that what this is is that these folks had decided that they didn't want to hire me. And the only reason I could think that they would not want to hire me is because of my age.

*Id.* at 158-159.

***Defendant's Hiring for Reopened Advanced Training Coordinator Position***

{¶50} In December 2020, one of the training coordinator positions reopened because Grusendorf voluntarily resigned. Holcomb Aff., ¶ 27. Plaintiff reapplied for the position and was one of three applicants eligible for hire. *Id.* at ¶ 28; Holcomb Depo., p. 70, Exh. 32, OAG001052. Ozbolt alone selected a candidate to fill this opening and made the recommendation for hire to HR. Holcomb Aff., ¶ 29. Agosta and Hardy did not participate in the hiring process for this reopened position. *See id.* Of the eligible applicants, Ozbolt wanted to recommend hiring Derek Foote, an internal candidate, who had worked closely with several law enforcement officers that were "very instrumental in maintaining [OPOTA's] crime scene classes". Ozbolt Depo, p. 123-124. These particular "active duty crime scene investigators" that would "work as adjutant instructors" initially would not come back to teach after OPOTA's reorganization, but "Foote was able to get them to come back and work the crime scene classes and hit the ground running." *Id.* Before officially recommending Foote, however, Ozbolt asked HR whether it was first necessary to reinterview Plaintiff, at which time Jennifer Gates, Defendant's HR Analyst— after confirming with Stacy Garber, Defendant's Deputy Director of HR—informed Ozbolt that it was not necessary to reinterview Plaintiff. Holcomb Aff., ¶ 30; Holcomb Depo., p. 70, Exh. 32, OAG001053-OAG001054; *see also* Ozbolt Depo., p.128-131, Exh. 32, OAG001053-OAG001054. Thereafter, Ozbolt formally submitted a recommendation to hire Foote, noting that he was:

> a former OPOTA employee who was laid off in May 2020. He has a unique
> skill set and extensive experience in crime scene and forensics, along with
> a M.S. in Forensic Sciences. He was known to be quite effective while at
> OPOTA. These subjects are in demand topics at OPOTA, and no current
> employees are qualified to instruct these blocks * * *.

Holcomb Depo, p. 70, Exh. 32, OAG001055. Foote, who was approximately 36 years old at the time he was offered the position, accepted the position. Holcomb Aff., ¶ 31. Plaintiff acknowledges that he has no reason to believe Foote was not qualified for this position. Zacharias Depo., p. 135.

***Defendant's Alternative Offer of Employment as a Medicaid Fraud Intake Officer***

{¶51} Sometime after November 2020, Garber reached out to Early and Ben Karrasch, Section Chief of Defendant's Health Care Fraud Section (HCFS), about offering Plaintiff an open Medicaid Intake Officer (intake officer) position. Early Depo., p. 31-32. Plaintiff had previously applied and was interviewed for an open Medicaid Special Agent (special agent) position in May 2020. *Id.* at 13-15. Early, who conducted the interviews for the special agent position along with six other people, felt Plaintiff was not one of the best candidates because, among other reasons, the writing sample he submitted as a part of the interview process "was not particularly good" and he expressed during the interview that "his skills with Microsoft Office products were not particularly strong." *Id.* at 15-24, 33-34. Plaintiff deponed that Early never made any age-related comments or otherwise suggested that he was not selected for this position because of his age. Zacharias Depo., p. 101-102.

{¶52} For the same reasons Plaintiff was not offered the special agent position, Early had reservations about offering Plaintiff the open intake officer position because, while it is considered entry level, it relies heavily on the use of Microsoft Excel and Microsoft Access and the duties of an intake officer "require the ability to interview and write clear, concise reports about what a complainant" says. Early Depo., p. 31-34. However, at the time the four intake officers had a shared duty to serve as the HCFS's primary evidence custodians and "[Early and Karrasch] felt reasonably confident that if [they] modified the structure of [the] four intake officers such that [they] could create one position that would do just evidence, felt reasonably confident that [Plaintiff] could do that." *Id.* at 33. While there remained some minor reservations about Plaintiff's inexperience with technology because "all of the evidence is processed through [a] case management [database] system", "[Early and Karrasch] felt confident that [they] could teach him to do that and that he could be successful as an intake officer doing just the evidence component." *Id.* at 34.

{¶53} In February 2021, Defendant offered Plaintiff a position as an intake officer. Rockwell Aff., ¶ 18; Zacharias Depo., Exh. 12. Ultimately, Plaintiff did not accept the position because it offered less money than he was making as a LETO and "[he] wanted to continue to * * * work at [his] career as a firearms instructor * * *." Zacharias Depo., p.

116.  Instead, Plaintiff works at Vance's Outdoors as a firearms instructor and he also continues to teach various courses for the International Associate of Law Enforcement Firearms Instructors.  *Id.* at 116-117; *see also* Rockwell Aff., ¶ 19.

## LAW AND ANALYSIS

{¶54} Plaintiff claims that Defendant violated the ADEA when it failed to hire him for any one of the six available positions for which he applied.  Whether a plaintiff's discrimination claim is brought pursuant to federal or state law, Ohio courts generally apply federal law interpreting Title VII.  *Clark v. City of Dublin*, 10th Dist. Franklin No. 2002 Ohio App. LEXIS 1426, 20 (March 28, 2002), citing *Little Forest Medical Ctr. of Akron v. Ohio Civil Rights Comm.*, 61 Ohio St.3d 607, 609, 575 N.E.2d 1164 (1991).

{¶55} The ADEA states that it is unlawful for an employer to: "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  To prevail, Plaintiff "must prove that age was a determining factor in the adverse action that the employer took against him."  *Phelps v. Yale Sec., Inc.,* 986 F.2d 120, 1023 (6th Cir.1993).  A disparate-treatment claim requires Plaintiff to "prove that age was the 'but-for' cause of the employer's adverse decision."  *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 175-177 (2009) ("the ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act").

{¶56} Plaintiff may establish but-for causation using either direct or circumstantial evidence. *Gross* at 177-178.  Moreover, "[t]he direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both." *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348-349 (6th Cir.1997).  Thus, "[i]f a plaintiff can produce direct evidence of discrimination then the *McDonnell Douglas-Burdine* paradigm is of no consequence.  Similarly, if a plaintiff attempts to prove its case using the *McDonnell Douglas-Burdine* paradigm, then the party is not required to

introduce direct evidence of discrimination." *Id.* Upon review, the Court finds that Plaintiff offers circumstantial evidence in support of his age discrimination claim.[7]

{¶57} Absent direct evidence, Plaintiff has the initial burden of establishing a prima facie case of intentional discrimination. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 258, 67 L.Ed.2 207, 101 S.Ct. 1089, citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To meet this burden for a claim of age discrimination based on a failure to hire, Plaintiff must show that (1) he was a member of a protected class, (2) he applied for a position and met the required minimum qualifications, (3) he was considered for and denied the position, and (4) he was rejected in favor of a substantially younger person with similar qualifications. *See Mayhue v. Cherry St. Servs., Inc.,* 598 Fed.Appx. 392, 403 (6th Cir.2015); *see also Wexler v. White's Fine Furniture*, 317 F.3d 564, 575 (6th Cir.2003) ("The prima facie burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field."); *see also Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir.2003) ("In age discrimination cases, the protected class includes all workers at least 40 years old and the fourth element is modified to require replacement not be a person outside the protected class, but merely replacement by a significantly younger person.").

{¶58} Once Plaintiff establishes a prima facie case of age discrimination, a presumption of unlawful discrimination arises and the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for its hiring decision. *Burzynski v. Cohen*, 264 F.3d 611, 622 (6th Cir.2001). Relevant case law establishes that "selecting the better candidate based on experience and interview performance is a legitimate, non-discriminatory reason for a hiring * * * decision." *See, e.g., Drummond v. Ohio Dept. of*

---

[7] In its motion, Defendant argued that any inquiries made by Ozbolt, Agosta, or Holcomb regarding Plaintiff's retirement did not constitute direct evidence of age discrimination. *See Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 724 (6th Cir.2012) ("questions concerning an employee's retirement plans do not alone constitute direct evidence of age discrimination."). Because Plaintiff failed to respond to this argument in his response and, instead, focused on arguing that such statements about retirement are circumstantial evidence of age discrimination, the Court will limit its analysis accordingly.

*Rehab. & Corr.,* 10th Dist. Franklin No. 21AP-327, 2022-Ohio-1096, ¶ 19, *citing Toledo v. Jackson,* 207 F.Appx.536, 537 (6th Cir.2006) (the court affirmed summary judgment in favor of the employer when its articulated, non-discriminatory reason for selecting the hired candidate was because she performed the best in the interview process).

{¶59} If Defendant successfully articulates a legitimate reason for its hiring decision, the presumption of unlawful discrimination is rebutted and the burden shifts back to Plaintiff to demonstrate that Defendant's reason was a pretext for age discrimination. *Burzynski* at 622*.* Plaintiff can prove Defendant's articulated reason is pretextual if he shows either: "'(1) the reason has no basis in fact, (2) the reason did not actually motivate the [adverse employment decision]; or (3) the reason was insufficient to motivate the [adverse employment decision].'" *Rainieri v. Alliance Tubular Prods. LLC,* N.D.Ohio No. 5:18-CV-307, 2019 U.S. Dist. LEXIS 118241, 14 (July 16, 2019), quoting *DeBra v. JPMorgan Chase & Co.*, 749 Fed.Appx. 331, 336 (6th Cir.2018). When deciding a motion for summary judgment, "the issue is whether the plaintiff has produced evidence from which a [trier of fact] could reasonably doubt the employer's explanation." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400, fn.4 (6th Cir.2009). A reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993).

{¶60} The Court recognizes that "there is no fixed, easy formula to prove the circumstances of discrimination" and "[s]uch claims generally involve nebulous, circumstantial evidence." *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1023 (6th Cir.2002). At the outset, the Court notes that there is no dispute among the parties as to the relevant facts in this case. Despite the magnitude of this record, the Court's examination of the evidence required no credibility determinations and, pursuant to Civ.R. 56, any arguable doubts were resolved in Plaintiff's favor. Instead, this case requires the Court determine the legal significance of pertinent facts, specifically whether Plaintiff's relative qualifications and the retirement comments made by Ozbolt and Agosta are probative of pretext. To make its determination, the Court analyzes each position in turn. For the reasons stated below, the Court finds that there is no evidence from which this Court

could reasonably doubt Defendant's explanations for rejecting Plaintiff in favor of other candidates and conclude that the real reason was "because of" his age. *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 400, fn.4 (6th Cir.2009).

### *Advanced Training Instructor and Advanced Training Coordinator Positions*

**{¶61}** The issue for the Court to decide is whether Defendant's decision to hire Grusendorf, Stoll, Coey, and Torres instead of Plaintiff for these positions was pretextual.

**{¶62}** Plaintiff points to retirement comments that Ozbolt and Agosta made to Plaintiff as circumstantial evidence of age discrimination. Initially, the Court notes that the record reveals the parties do not dispute the occurrence or the nature of the retirement comments made by Ozbolt or Agosta. Any arguable dispute involves, at most, the exact time that any such statements were made, and the Court resolved any doubt in favor of Plaintiff. At any rate, Plaintiff states the comments were not made during the time of the interview process or with regard to whether Plaintiff would be hired for one of the firearms training instructor or training coordinator positions.

**{¶63}** While age-related comments do not need to be made in the context of an adverse employment decision in order to reveal an employer's discriminatory state of mind, "inquiries into an employee's retirement plans generally do not constitute age discrimination." *Rainieri* at 15, fn.4, citing *Sander v. Gray TV Group, Inc.*, 478 F.Appx. 256, 265 (6th Cir.2012) (the court found that the employer was entitled to judgment as a matter of law on plaintiff's age discrimination claim when it did not rehire plaintiff because of his abrasive management style, and plaintiff's relative qualifications, previous work evaluations, and his subjective belief that younger employees were being hired because the workforce was getting close to retirement was not sufficient evidence of pretext to survive summary judgment); *but see Cooley v. Carmike Cinemas*, 25 F.3d 1325, 1331 (6th Cir.1993) (the court held that two comments made long before the adverse employment decision were suggestive enough "to reveal [the ultimate decision maker's] state of mine and reflect a deep-rooted, ongoing pattern that is anything but isolated."). When determining whether repeated inquiries about retirement can support an inference of discrimination, courts "carefully evaluate factors affecting the statement's probative

value, such as the declarant's position in the corporate hierarchy, the purpose and content of the statement, and the temporal connection between the statement and the challenged employment action." *Leonard v. Towers*, 6 Fed.Appx. 223, 229-231 (6th Cir.2001), quoting *Ercegovich v. Goodyear*, 154 F.3d 344 (6th Cir.1998) (internal quotation marks omitted) (the court affirmed summary judgment in favor of the employer when plaintiff did not submit sufficient evidence to allow a reasonable fact finder to conclude that the employer discriminated against him in violation of the ADEA).

**{¶64}** With respect to Ozbolt telling Plaintiff that "he thought he would already be down in Florida", Plaintiff points to only one conversation that occurred more than a month after Plaintiff was notified that he was not selected for any of the four openings at issue. Moreover, Ozbolt and Holcomb also discussed their own retirement experiences during this conversation. The Court does not find this lone conversation, which was far-removed from the decision-making process and tenuously related to age, supports an inference of discriminatory motive in failing to rehire Plaintiff. *See, e.g., Scott v. Potter*, 182 F.Appx. 521, 526 (6th Cir.2006) (the court affirmed summary judgment in favor of the employer where plaintiff pointed to his supervisor saying, "Why don't you retire and make everybody happy" because the plaintiff "offered no evidence that defendants use "retire" as a proxy for "too old" or some other derogatory, age-based term."). Inquiries about an employee's impending retirement that indicate discriminatory motive will generally involve far more flagrant statements than what occurred here. *See Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir.1997) (collecting cases).

**{¶65}** With respect to Agosta, Plaintiff points to three separate conversations. On the first occasion, Agosta and Plaintiff both expressed how they would like to reach 30 years of service before retiring. While Agosta initiated the conversation, Plaintiff submits no evidence that Agosta brought up the topic to suggest that Plaintiff retire. A mutual conversation about years of service between two people that are similarly situated with regard to retirement is too ambiguous to fairly draw an inference of age-motivated discriminatory bias. *See Scott* at 526 ("Yet, 'years of service' is conceptually distinct from 'age.' While both terms apply to many of the same individuals in various contexts, the overlap is not perfect.").

{¶66} After Plaintiff's position was eliminated, Agosta said to Plaintiff "you can always retire and go to Florida" when he saw Plaintiff at the tactical training center collecting his belongings following OPOTA's reorganization.  Months later in January 2021, Agosta said to Plaintiff, "well, heck, you can always go to Florida and retire to Florida and be near your sister" when they again saw each other at the tactical training center.  Plaintiff argues that the three times Agosta initiated conversations with him about retirement is sufficient to raise an inference of discriminatory intent to defeat a motion for summary judgment.  *See Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir.1997) ("pressure to retire occurs when the employer initiates the questioning and then pointedly suggests retirement.").  The Court disagrees.

{¶67} Not only did these comments come after Plaintiff was no longer employed with Defendant, Plaintiff had already applied and been considered for the firearms training instructor and training coordinator positions by the time Agosta made these remarks. There is no evidence that Agosta made any reference to Plaintiff's age during these conversations or was trying to coerce Plaintiff to retire or otherwise convince him to not apply for any open positions with Defendant.  *Compare Braverman v. Penobscot Shoe Co.,* 859 F.Supp. 596, 601 (D.Me. 1994) (the court said an inference of discrimination could be made when the employer provided plaintiff with an unsolicited and unwelcome retirement information package and suggest that he retire).  Furthermore, it was Plaintiff himself who first told Agosta that he had family in Florida.  It is significantly more reasonable to conclude that Agosta, who offered an idea about retirement only two times separated by several months following any decision-making process of which he took part, offered these remarks about long-term plans to Plaintiff as a friendly suggestion rather than a covert attempt to force retirement. *See, e.g., Woythal* at 246-248 (the court affirmed summary judgment in favor of the employer despite several inquiries into plaintiff's "plans for the future" because such inquires did not amount to evidence that any adverse employment decision was because of plaintiff's age); *see also Anderson v. U.S. Bank National Association,* S.D.Ohio No. 2:14-cv-2167, 2016 U.S. Dist. LEXIS 84728, 28-29 (June 28, 2016) citing *Woythal* at 247 ("Although Ficken's prodding into Anderson's retirement plans may have been more frequent than normal, courts have typically only

found retirement queries to constitute evidence of discrimination when the questioning is egregious or incorporates some type of direct reference to age."); *see also Diebel v. L&H Res., LLC*, S.D.Mich. No. 08-13823, 2010 U.S. Dist. LEXIS 13590, 19-21 (Feb. 17, 2010) (the court affirmed summary judgment in the employer's favor after finding that a supervisor's inquiries about Plaintiff's retirement were merely "friendly inquiries" because "they were not made in the context of a discussion about a specific hiring decision" and "were made a full half-year before Plaintiff was laid off").

{¶68} Moreover, Plaintiff deponed that he was not bothered by these comments because of any negative connotation about his age, but because it indicated Agosta did not value his worth to the agency. Even if the Court concluded that, taken together, Agosta's three retirement remarks evinced a desire to see Plaintiff not be rehired as a firearms training instructor or training coordinator, Plaintiff submits no evidence that any such desire was "because of" Plaintiff's age. *See Hale v. ABF Freight Sys.*, 503 Fed.Appx. 323, 331 (6th Cir.2012), quoting *Scott at* 526 ("In short, 'retire' and 'age' are not synonyms."); *see also Byrnes v. LCI Communs. Holdings*, 77 Ohio St.3d 125, 130 ("Absent some causal connection or link between an employer's discriminatory statements or conduct and a plaintiff-employee, there is no permissible inference that the employer was motivated by discriminatory animus to act against the plaintiff-employee."). Moreover, Agosta was not the ultimate decision maker for which candidates were hired for these positions. While Agosta certainly had influence in the interview process and made a recommendation as to who he felt were the top candidates, it is not disputed that Ozbolt had the final decision as to who was selected. Given the circumstances present in this case, the Court finds that the remarks regarding retirement are not probative of pretext as a matter of law.

{¶69} Plaintiff additionally argues that he was the most qualified candidate for these positions. For relative qualifications to establish triable issues of fact as to pretext, Plaintiff must show "either (1) the plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former, or (2) plaintiff was as qualified * * * if not better qualified than the successful applicant, and the record contains 'other probative evidence of discrimination.'" *Bartlett v. Gates*, 421

Fed.Appx. 485, 490-491 (6th Cir.2010), quoting *Bender v. Hecht's Depot. Stores,* 445 F.3d 612, 627-628 (6th Cir.2006).

{¶70} Upon review, the Court finds that Plaintiff has not submitted sufficient evidence that he was the "plainly superior" candidate such that no reasonable employer would have rejected him in favor of the other applicants.  While there is no dispute that Plaintiff's resume contains more training courses and years of experience than the hired candidates, it is also not disputed that Plaintiff scored lower on the objective interview criteria than the selected candidates.  Furthermore, Plaintiff admits he has no actual facts or personal knowledge as to the qualifications and experience of the hired candidates with regard to the requirements of the firearms training instructor and training coordinator positions.  Plaintiff's belief that Coey, Torres, Grusendorf, and Stoll are less qualified rests entirely on his knowledge of what the former requirements were to be a LETO before OPOTA's reorganization, and not the rewritten requirements for the new positions.  Thus, Plaintiff has not provided a sufficient basis for the Court to doubt the neutrality of the hiring committee's assessment as to the objective interview criteria. *See Leonard* at 232, citing *Smith v. Chrysler,* 155 F.3d 799 (6th Cir.1998) (the law does not "require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse action.").

{¶71} Upon extensive review, the record contains no evidence upon which this Court can infer that the hiring committee's assessment of Plaintiff's interview performance was untrustworthy or pretextual.  *Hickman v. Dayton*, 39 F.Appx.243, 245 (6th Cir.2002) (in a case where the employer's nondiscriminatory reason for failing to promote the plaintiff was "poor performance at the interview stage", the court found summary judgment in favor of the employer proper when the employee submitted no evidence to infer that the employer's reason was pretextual).  While Plaintiff takes issue with Agosta, Ozbolt, and Hardy considering their subjective experiences with Plaintiff when assessing him on the objective interview criteria, an employer may "make hiring decisions based on its familiarity and personal relationships with candidates." *McDaniels v. Plymouth-Canton Cmty. Sch.,* 755 Fed.Appx.461, 470 (6th Cir.2018); *see also Flowers v. Westrock Servs.*,

979 F.3d 1127, 1129 (6th Cir.2020) ("[O]utside of strict age-based considerations, the ADEA does not empower job applicants to second-guess the qualifications preferred by a potential employer.").

{¶72} Even if Agosta, Ozbolt, and Hardy provided varying explanations for how they perceived the candidates with respect to the rater sheets and assigned scores during the interview process, their overall explanations for why they did not recommend Plaintiff to HR for these positions did not contradict one another nor did they reflect any discriminatory animus.   Put simply, the Court has no reason to doubt Defendant's truthfulness with regard to Plaintiff's interview performance.  *See Alexander v. Ohio State Univ. College of Soc. Work*, 697 F.Supp.2d 831, 845-846 (S.D.Ohio 2010) (the court found no "shifting reasons" supporting an inference of discrimination when the employer was "merely listing as many reasons as possible in support of [its] decision.").

{¶73} Plaintiff points to *Ceglia v. Youngstown State Univ.*, 2015-Ohio-2125, 38 N.E.3d 1222 (10th Dist.) as support for this Court finding a genuine issue of material fact to be decided at trial.  In *Ceglia*, the court found that there was a genuine issue of material fact whether plaintiff was as qualified, if not better qualified, than the hired individual because the hiring decision was "based, in large part, on the individual committee member's subjective belief that [the hired individual] was a superior candidate compared to [plaintiff] rather than on specific objective evidence."  Additionally, the court in *Ceglia* found other probative evidence of age discrimination when one of the hiring committee members indicated that they were seeking candidates for the position who were "mid-career" and "had not 'been around for a long time.'"  *Ceglia* at ¶ 44.

{¶74} Unlike *Ceglia*, Defendant in this case articulated objective reasons, in addition to its subjective reasoning, why Plaintiff was not a top candidate.  An example of Defendant's objective reasoning is Plaintiff's inexperience with technology – a weakness recognized by Plaintiff who represented during his interview that he may have a "learning curve" with some of the technology necessary for the new positions.  Based on their individual assessments of the objective criteria from Plaintiff's responses during the interview, the hiring committee assigned Plaintiff average or below-average scores—both Agosta and Hardy rated that Plaintiff "meets minimum requirements", and Ozbolt rated

that Plaintiff had "[v]ery little computer knowledge/experience"—in computer experience for these positions. The Court is not persuaded by Plaintiff's assertion that these scores show that Agosta, Hardy, and Ozbolt engaged in ageist stereotyping when Plaintiff himself stated that he may not have used some of the technology required to perform in the role.

{¶75} Based on the evidence before the Court, the candidates hired instead of Plaintiff had the same or better scores associated with "computer experience" in comparison. Plaintiff provides no evidence regarding the hired candidates' experience or background with technology to cause the Court to reasonably doubt the hiring committees' assessment regarding this objective criterion. Other objective criteria can be seen in the rater sheets.

{¶76} With regard to the objective criteria, moreover, it is not the Court's province "to second-guess [D]efendant's business judgment to rank employees in this manner, to rate [P]laintiff as it did in particular categories, and to assess how [P]laintiff's skills in various categories deemed essential * * * compared to those of other [candidates] * * *." *Bynum v. Flour Fernald, Inc.*, S.D.Ohio No. C-1-04-361, 2006 U.S. Dist. LEXIS 7796, 23-24 (after plaintiff was terminated during a reduction-in-force because she was among the lowest ranked employees for not having the skills necessary to complete the job, the court granted summary judgment in favor of the employer when plaintiff submitted no evidence that defendant altered the normal ranking process to give plaintiff "a less than desirable score in a heavily weighted category out of a desire to discriminate based on plaintiff's age or any other basis."). Additionally, unlike *Ceglia*, the record here is void of any other probative evidence of discrimination. The evidence before this Court does not demonstrate any age-related bias upon which the Court could reasonably infer intentional age discrimination.

{¶77} Considering all the evidence and the reasonable inferences drawn therefrom, Plaintiff did not present sufficient evidence for this Court to conclude that any scoring or hiring recommendation by the hiring committee members was made because of Plaintiff's age. Particularly relevant, Hardy also scored Plaintiff similarly, or lower in certain categories, on the objective interview criteria in comparison to Ozbolt and Agosta,

despite having never made any age-related comments to Plaintiff and having the least amount of personal knowledge about him.  Plaintiff provides no explanation or evidence to support an inference that Hardy's assessment of Plaintiff was pretextual other than his personal belief that Agosta and Ozbolt did not want to hire him because of his age and that, in turn, influenced Hardy's scoring.  Although the Court properly considers this uncorroborated subjective opinion as valid Civ.R. 56 evidence, Plaintiff must provide more than an unsubstantiated suspicion to survive summary judgment on an ADEA claim for intentional age discrimination.  *See, e.g., Rainieri* at 15, quoting *Peters* at 470 ("[M]ere conjecture that [the] employer's explanation is pretext for intentional discrimination is an insufficient basis for denial of summary judgement."); *see also Kiser v. United Dairy Farmers*, 10th Dist. Franklin No. 22AP-539, 2023-Ohio-2136.

{¶78} Therefore, Plaintiff failed to meet his burden to show that Defendant's nondiscriminatory reasons either had no basis in fact, did not actually motivate its failure to hire Plaintiff, or that the reason was insufficient to motivate selecting Grusendorf, Stoll, Coey, or Torres.  Accordingly, the Court GRANTS Defendant's motion for summary judgment as to Plaintiff's claim that Defendant discriminated against him based on age when it failed to hire him for the firearms training instructor and training coordinator positions.

### *Curriculum Design Specialist Position*

{¶79} Considering the Curriculum Design Specialist position, there is no dispute that Plaintiff (1) was a member of a protected class, (2) applied for the position and met the required minimum qualifications, (3) he was considered for and denied this position, and (4) that he was rejected in favor of Cury.  However, Defendant argues that Plaintiff cannot state the prima facie case for the Curriculum Design Specialist position because Cury was not substantially younger than Plaintiff.  In his response, Plaintiff did not address Defendant's argument that Plaintiff cannot state a prima facie case regarding this position and incorrectly concluded: "Defendant conceded that Plaintiff made out a *prima facie* case."  *See* Plaintiff's Memorandum in Opposition, p. 2; *but see* Defendant's Motion for Summary Judgment, p. 19-20.  In its reply, Defendant reasserted its position that Plaintiff

cannot state a prima facie case and argues that Plaintiff's failure to address the argument in his response warrants summary judgment in its favor on this claim.[8]

{¶80} Nevertheless, Defendant alternatively argues in its motion that, even if the Court finds that Plaintiff established a prima facie case, it is entitled to judgment as a matter of law because Plaintiff also cannot show that Defendant's legitimate, nondiscriminatory reason for not hiring him were pretext for age discrimination. In his response, Plaintiff argues generally that "evidence exists" which shows Defendant's articulated reasons were pretext for age discrimination. *See* Plaintiff's Memorandum in Opposition, p. 8.

{¶81} Upon review, the Court finds Plaintiff did not meet his burden to establish a prima facie case. Generally, establishing the prima facie elements is not an onerous burden because this "phase 'merely serves to raise a rebuttable presumption of discrimination by eliminating the most common nondiscriminatory reasons' * * *" for an adverse employment decision. *Brooks v. Franklin Plaza Nursing Home*, N.D.Ohio No. 1:19CV272, 2020 U.S. Dist. LEXIS 216103, 10 (Nov. 18, 2020), quoting *Cline v. Catholic Diocese of Toledo,* 206 F.3d 651, 660 (6th Cir.2000). However, Plaintiff fails to meet his burden to prove that he was rejected in favor of a "substantially younger" candidate when the age difference is six years or less. *See Grosjean* at 340 ("we hold that, in the absence of direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and a replacement is not significant."). There was a six year age difference between Plaintiff and Cury at the time relevant to this analysis—with Plaintiff being 63 years old and Cury being 57 years old—and Defendant is, therefore, entitled to judgment as a matter of law. *See, e.g., id.*

{¶82} Even if the Court assumed that Plaintiff established a prima facie case for purposes of summary judgment, the Court finds that this claim would ultimately fail

---

[8] While the Court acknowledges that federal courts in Ohio have well established that a court may decline to consider the merits of a claim when the nonmoving party fails to respond to arguments made in the moving party's motion for summary judgment, Ohio's state jurisprudence is not clear on the issue in the context of dispositive motion practice. *See Hope Acad., Broadway Campus v. White Hat Mgmt., LLC,* 10th Dist. Franklin No. 20AP-475, 2022-Ohio-178, ¶ 36, 41-42. Accordingly, this Court will consider the parties' arguments on the merits.

because the evidence that Plaintiff advances to rebut Defendant's articulated reasons does not provide a basis upon which a reasonable fact finder could conclude that Defendant's reasons were a pretext for unlawful age discrimination. Initially, the parties' briefs indicate there is no dispute that Defendant meets its burden to articulate legitimate, nondiscriminatory reasons for its decision to hire Cury instead of Plaintiff. Plaintiff also acknowledges that he does not have any evidence that his age was the "but for" reason he was not hired for this position. Additionally, Plaintiff scored lower than Cury on the writing assessment portion of the interview process for this position, and Plaintiff deponed that he had no reason to dispute the accuracy of the given interview scores or Cury's qualifications. Furthermore, "more than an unsubstantiated suspicion is necessary to survive summary judgment." *Rainieri* at 15, citing *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 478 (6th Cir.2002).

{¶83} Therefore, Plaintiff failed to meet his burden to show that Defendant's nondiscriminatory reasons either had no basis in fact, did not actually motivate its failure to hire Plaintiff, or that the reason was insufficient to motivate selecting Cury. Therefore, the Court GRANTS Defendant's motion for summary judgment as to Plaintiff's claim that Defendant discriminated against him based on age when it failed to hire him for the Curriculum Design Specialist position.

### *Re-Opened Advanced Training Coordinator Position*

{¶84} With respect to the reopened training coordinator position after Grusendorf voluntarily resigned, it is not in dispute that Plaintiff states the prima facie case for this reopened position or that Defendant provided a legitimate reason for hiring Foote. While "Plaintiff focuses his arguments [] largely on the Advanced Training Instructor roles and Coordinator position in June 2020", he nevertheless argues that Defendant's explanation for failing to hire him for this opening was pretextual. Plaintiff's Memorandum in Opposition, p. 8. Upon review, the Court disagrees.

{¶85} While the record supports the conclusion that Ozbolt had Foote in mind for this position when it reopened because of Foote's crime scene experience and contacts with Cincinnati law enforcement, it was HR who informed Ozbolt that he did not have to

reinterview Plaintiff for this position before recommending Foote. Plaintiff provides no evidence that HR's decision to not extend Plaintiff an interview for this opening was because of his age or to otherwise support an inference of intentional discrimination. Furthermore, Plaintiff admits he has no knowledge of Foote's background or qualifications, and he does not provide any evidence that his experience in crime scene investigation or his contacts with outside law enforcement was similar or superior to Foote's.

{¶86} The record simply contains no other probative evidence upon which this Court could find that Plaintiff's relative qualifications establish a triable issue of fact as to pretext concerning this opening. Because Plaintiff failed to meet his burden to show that Defendant's nondiscriminatory reasons either had no basis in fact, did not actually motivate its failure to hire Plaintiff, or that the reason was insufficient to motivate selecting Foote, the Court GRANTS Defendant's motion for summary judgment as to Plaintiff's claim that Defendant discriminated against him based on age when it failed to consider him for the reopened training coordinator position.

## CONCLUSION

{¶87} For the reasons stated above, the Court finds that Plaintiff does not present sufficient evidence to demonstrate that there are triable issues of material fact. *See Mitchell v. Mid-Ohio Emergency Servs., LLC,* 10th Dist. Franklin No. 03AP-981, 2004-Ohio-5264, ¶ 12, citing *Turner v. Turner*, 67 Ohio St.3d 337, 340, 617 N.E.2d 1123 ("In the summary judgment context, a 'material' fact is one that might affect the outcome of the suit under the applicable substantive law."). Accordingly, the Court GRANTS Defendant's motion for summary judgment.

LISA L. SADLER
Judge

**[Cite as *Zacharias v. Ohio Atty. Gen.*, 2023-Ohio-3142.]**

| | |
|---|---|
| JERRY ZACHARIAS | Case No. 2021-00141JD |
| Plaintiff | Judge Lisa L. Sadler |
| v. | <u>JUDGMENT ENTRY</u> |
| OHIO ATTORNEY GENERAL | |
| Defendant | |

## IN THE COURT OF CLAIMS OF OHIO

{¶88} For the reasons set forth in the decision filed concurrently herewith, Defendant's motion for summary judgment is GRANTED and judgment is rendered in favor of Defendant. All previously scheduled events are VACATED. Court costs are assessed against Plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

LISA L. SADLER
Judge

**Filed August 4, 2023**
**Sent to S.C. Reporter 9/7/23**