John LEONARD, Plaintiff–Appellant,

v.

TWIN TOWERS, Defendant–Appellee.

No. 99–4221.

United States Court of Appeals,
Sixth Circuit.

March 1, 2001.

NATHANIEL R. JONES, Circuit Judge.

On February 20, 1998, Appellant John Leonard brought an employment discrimination suit against Appellee Twin Towers in the United States District Court for the Southern District of Ohio. Leonard alleged that his former employer violated the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et. seq., and Ohio Rev.Code § 4112 when it fired him because of his age. Pursuant to 28 U.S.C. § 636(c), the parties consented to the jurisdiction of a United States Magistrate Judge and further consented that any appeal from the United States Magistrate Judge's judgment would lie directly to the Court of Appeals for the Sixth Circuit. After reviewing the evidence, the Magistrate Judge granted summary judgment in favor of Twin Towers. John Leonard has appealed. For the reasons that follow, we AFFIRM the Magistrate Judge's decision.

## I. FACTS

The Appellee, Twin Towers, is a non-profit retirement community in Cincinnati. The Appellant, John Leonard, worked at Twin Towers from 1980 through 1997. During that period, he served as Assistant Supervisor of Maintenance, Supervisor of Maintenance, and as Assistant Director of Plant Maintenance. On June 10, 1997, Mr. Leonard was discharged from his employment for allegedly making racial slurs about and in the presence of other employees. Mr. Leonard contends that these allegations were pretextual and that he was discharged because of his advancing age. Mr. Leonard was sixty-eight years old when Twin Towers terminated his employment.

For the last twelve years of his employment at Twin Towers, John Leonard worked under the supervision of Bert Turner. During that time period, Turner

Before NATHANIEL R. JONES, SILER, and CLAY, Circuit Judges.

gave Leonard multiple outstanding evaluations. In 1990, 1992, and 1995, Turner rated Leonard as "outstanding" in five out of seven categories. (Appellant's Br. at 6.) Leonard alleges that despite his outstanding performance, Turner regularly inquired about his retirement even though he always told Turner that he planned on working until he was 75. Furthermore, Leonard states that when he gave Turner this stock answer, Turner often responded by telling him that he should "retire at about 70 and go out and enjoy life." (J.A. at 152–156.) According to Leonard, Turner also talked about preparations to interview for his replacement and repeatedly told him that he should "start thinking about retiring." *Id.* Leonard admits that at the time that Turner made these comments he thought that Turner was just making friendly conversation.

The Appellant's minor son, David Leonard, was temporarily employed by Twin Towers as a part time employee. On April 28, 1997, William Parker, the Director of Resident Services, and Mary Bennett, the Director of Human Resources, fired him for engaging in inappropriate behavior at work.

According to Appellant's co-worker Rose Hogue, John Leonard entered her office on May 20, 1997 and stated that "if it wasn't for Mary, that nigger in Human Resources, and that blankety-blank Parker, David would be here." (J.A. at 208–09.) Ms. Hogue reported these statements to Mary Bennett, who in turn reported them to Mr. Parker. Because Leonard's supervisor, Bert Turner, was on sick leave, Parker began an investigation into the incident.

Mr. Parker interviewed Sam Mahan, a Twin Towers security employee who worked under the Appellant's supervision, and asked him if he had heard Leonard use improper language against Ms. Bennett. Mahan responded that he had not but mentioned that he had heard Leonard use words like "nigger, darkies, and blackies" on other occasions. (J.A. at 84.) Mahan further asserted that he heard the Appellant say that it was necessary to install security cameras because black employees "were lazy" and "would steal." (J.A. at 85.)

Mr. Parker reported these findings to Twin Towers Administrator Scott McQuinn. McQuinn told Parker to report what he knew to Bert Turner, who then took over the investigation. McQuinn also instructed Susan McConn to replace Ms. Bennett as the human resource advisor for this investigation because Mary Bennet was the target of Leonard's alleged racist comment. It is undisputed that Turner's role was strictly investigative and that Susan McConn was responsible for determining what, if any, disciplinary action would be taken against Leonard.

Mr. Turner's investigation consisted of interviews with Rose Hogue, Nancy Knipe, Sam Mahan, and Sue Stanley. Ms. Hogue had known the Appellant since 1981 and ate lunch with him every day. In her interview with Turner, she reasserted that Leonard used a racial slur against Ms. Bennett because he was upset about his son being fired. Similarly, Sam Mahan also reiterated his earlier statements that he had heard the Appellant make racist comments about black employees. The other employees that Turner interviewed provided no additional evidence against Leonard.

Of the four individuals that Mr. Turner interviewed, only one, Sue Stanley, was a co-worker of John Leonard's in the maintenance department. Turner has stated that he did not interview more of Leonard's co-workers in the maintenance department because he suspected that they

would not be truthful on account of their allegiance to Leonard.

In her deposition, Mary Bennett confirmed that Ms. Hogue told her that John Leonard had made a racial slur against her. However, in the same deposition, Ms. Bennett also stated that her notes indicate that Hogue told her that Leonard was angry with her because of the way that she was handling a situation involving his wife, who was also employed at Twin Towers.[1] These notes are not entirely consistent with Rose Hogue's statements to Turner and others that Leonard was mad at Mary Bennett for firing his son. Bert Turner claims that he did not uncover this inconsistency because he did not interview Mary Bennett or look at her notes. He has stated that he did not review Mary Bennett's notes because she was not a witness to the alleged conduct, and as the target of Leonard's comments she was likely to be biased against him.

On June 3, 1997, Mr. Turner and Ms. McConn met with the Appellant to discuss the allegations against him. Leonard denied that he had used racial slurs and asked to talk to Ms. Hogue about her accusation against him. In an attempt to defend himself, Mr. Leonard stated that "I could have said that black bastard, if I was going to say anything, about Bill [Parker], but not Mary [Bennett.]" (J.A. at 92.) Bill Parker is white. Turner subsequently suspended John Leonard with pay pending further investigation.

After the meeting, Mr. Turner reinterviewed Ms. Hogue and Mr. Mahan. They both repeated their original allegations concerning Leonard. Mr. Turner then handed a report of his investigation over to Ms. McConn. After reviewing the information, she found that Leonard did in fact make the racial slur against Ms. Bennett. Ms. McConn stated that this finding was based on the allegations of Rose Hogue and Sam Mahan and the ease with which the Appellant used the phrase "black bastard" in the June 3, 1997 meeting.

On June 10, 1997, John Leonard was summoned to a meeting with McConn and Turner. At the meeting he requested to be informed of the other employees who had indicated knowledge of his behavior. He also offered to bring in other employees to testify on his behalf. Both of his requests were denied, and Ms. McConn informed Leonard that his employment with Twin Towers was terminated. (J.A. at 139.) The Appellant refused to sign the termination agreement, and on February 20, 1998, he filed suit against Twin Towers.

As noted above, John Leonard claims that Twin Towers violated the ADEA by firing him on the basis of his age.[2] Before a Magistrate Judge, Leonard argued that Twin Towers' claim that they terminated him because of reports that he had used racial slurs was a pretext for age discrimination. After considering the evidence, the Magistrate Judge found that Leonard did not present sufficient evidence to allow

---

1. The Appellant's wife, Ann Leonard, works for Twin Towers as a supervisor in the laundry department. In April or May of 1997, Debby Andy, an employee who was supervised by Mrs. Leonard, complained about Mrs. Leonard's job performance. Noticing that morale seemed to be down in the whole department, Mr. Parker, the Director of Resident Services, and Ms. Bennett, the Director of Human Resources, responded by holding a series of meetings.

2. The ADEA declares that it is unlawful for an employer to "discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age." 29 U.S.C. § 623(a)(1).

a reasonable jury to conclude that Twin Towers' articulated reason for firing Leonard was a pretext for age discrimination. Accordingly, the court granted Twin Towers' motion for summary judgement.

## II. STANDARD OF REVIEW

■ This court exercises *de novo* review over the Magistrate Judge's grant of summary judgement. *See Terry Barr Sales Agency, Inc. v. All–Lock Co.*, 96 F.3d 174, 178 (6th Cir.1996). When reviewing the record, all inferences shall be drawn in the light most favorable to the nonmoving party. *See Woythal v. Tex–Tenn Corp.*, 112 F.3d 243, 245–46 (6th Cir.1997). However, an opponent of a motion for summary judgement "may not rest upon mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Miller v. Lorain Board of Elections*, 141 F.3d 252, 256 (6th Cir.1998). "If after reviewing the record as a whole a rational factfinder could not find for the nonmoving party, summary judgement is appropriate." *Ercegovich v. Goodyear*, 154 F.3d 344, 349 (6th Cir.1998) (citing *Matsushita v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

## III. DISCUSSION

### A. Background

■ As a plaintiff claiming age discrimination under the ADEA. John Leonard bears the initial burden of establishing a *prima facie* case of discrimination. He can meet this burden by providing direct or circumstantial evidence that raises a genuine issue that his employer discriminated against him or by simply proving that (1) he was a member of a protected class, (2) that he suffered an adverse employment action, and (3) that he was qualified for the position and was replaced by a younger person. *See Manzer v. Diamond Shamrock Chemicals Company*, 29 F.3d 1078, 1081 (6th Cir.1994) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Both Parties agree that Leonard was a member of a protected class, that he suffered an adverse employment action, and that he was replaced by a younger employee even though he was qualified. Accordingly, Leonard has met his initial burden of establishing a *prima facie* case of discrimination.

■ Once plaintiff establishes a prima facie case, the employer is faced with a "burden of articulation" and must set forth "some legitimate non-discriminatory reason for the plaintiff's discharge." *Cooley v. Carmike Cinemas*, 25 F.3d 1325, 1329 (6th Cir.1994); *see also Phelps v. Yale Security*, 986 F.2d 1020, 1024 (6th Cir. 1993). In the instant case, Twin Towers has met this burden by asserting that Leonard was terminated because he used a racial slur in reference to Mary Bennett.

Thus, the burden shifts back to Leonard, who must demonstrate that Twin Towers' explanation for his firing is a pretext for age discrimination. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times on the plaintiff") (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 8, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). In order to do so, Plaintiff must produce sufficient evidence from which the jury could "reasonably reject the Defendant's explanation" and infer that Twin Towers "intentionally discriminated" against him. *See Woythal*, 112

F.3d at 246–47 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 519, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).[3]

## B. Leonard's Evidence of Pretext

█ Plaintiff Leonard argues that he has put forth sufficient evidence to allow a rational jury to reject Twin Towers' assertion that they fired him because he used racial slurs and to infer that his termination was motivated by age discrimination. Specifically, Leonard alleges that Bert Turner's efforts to convince him to retire even though he continued to do "outstanding" work demonstrate that Turner was biased against him because of his age. He further asserts that this inference of bias is corroborated by the cursory nature of Turner's investigation of the allegations against him. Leonard contends that the fact that his employers fired him on the basis of such an inadequate investigation is the ultimate proof that the decision to terminate him was based on age discrimination.

### 1. Bert Turner's Comments

As noted above, Leonard alleges that his supervisor, Bert Turner, asked him when he was going to retire as often as once a week, even though he consistently told Turner that he planned on working until he was 75. Plaintiff has also stated that Turner regularly told him that "he should start thinking about retirement" and recommended that he "retire at about 70 and go out and enjoy life." (J.A. at 152–56.) Leonard asserts that these constant inquiries and statements indicate that Turner wanted to replace him because of his age even though he continued to do "outstanding" work.

█ It is widely acknowledged that age-related comments referring directly to a worker may support an inference of age discrimination. *See Phelps*, 986 F.2d at 1025 (citing *McDonald v. Union Camp*, 898 F.2d 1155, 1162 (6th Cir.1990)). However, this Court has also held that not all age-related comments create a genuine issue of material fact necessary to survive summary judgment. *See Gagne v. Northwestern National Insurance Co.*, 881 F.2d 309, 314 (6th Cir.1989). As noted above, the ultimate question in an age discrimination suit is whether the employer intentionally discriminated against the plaintiff because of his age. *See Woythal*, 112 F.3d at 246–47. Accordingly, in order for age-related comments to support a finding of intentional discrimination, there must be some connection between the discriminatory comments and the adverse employment decision. "[I]solated and ambiguous statements ... 'are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination.'" *See Gagne*, 881 F.2d at 314 (citing *Chappell v. GTE*, 803 F.2d 261, 268 n. 2 (1986)).

Twin Towers argues that Turner's comments about retirement are too ambiguous to support a finding of age discrimination because Turner was merely making a friendly inquiry. Twin Towers cites *Woythal v. Tex–Tenn Corp.*, 112 F.3d 243 (6th Cir.1997). *In Woythal*, plaintiff claimed

---

**3.** The Supreme Court recently held that "[a] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000). In *Manzer*, this court recognized that a plaintiff can prove pretext in a variety of ways. Plaintiff can set forth evidence "either (1) that the [Defendant's] proffered reasons have no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge." 29 F.3d 1078, 1084 (6th Cir.1994) (citing *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 513 (7th Cir.1993)).

that high ranking members of the company for which he worked continued to ask him about his retirement to the point that he believed that he was being pressured to retire. This Court held that the company President's questions about his plans for the future could not support a finding of age discrimination because they were "more of a friendly inquiry than a covert attempt to force retirement." *Id.* at 247. Twin Towers emphasizes that in this case Leonard himself has admitted that at the time that these conversations took place he thought that Turner's comments were made in a friendly context. Based on this admission, appellee concludes that Turner's comments cannot support a finding of age discrimination.

■ While it is true that an employer's "friendly" inquiries about retirement cannot usually support a finding of age discrimination, we recognize that not all inquiries about retirement are "friendly" and that repeated · and unwelcome inquiries may certainly be relevant to a showing of age discrimination. In the case of *Ercegovich v. Goodyear,* 154 F.3d 344 (6th Cir. 1998), this court took a flexible approach to assessing the relevancy of age-related remarks. We stated that: "[T]he courts must carefully evaluate factors affecting the statement's probative value, such as 'the declarant's position in the corporate hierarchy, the purpose and content of the statement, and the temporal connection between the statement and the challenged employment action[.]" *Id.* at 357 (citing *Ryder v. Westinghouse Elec. Corp.,* 128 F.3d 128, 133 (3d Cir.1997)). Our decision also emphasized that "we do not view each discriminatory remark in isolation, but are mindful that the remarks buttress one another as well as any other pretextual evidence supporting an inference of discriminatory animus." *Id.* at 356. In order to determine whether Bert Turner's inquiries

about retirement can support a finding of discriminatory animus in this case, we must carefully examine the nature of the inquiries and the context in which that inquiry was made.

The parties have offered conflicting evidence regarding the nature and frequency of Bert Turner's conversations with John Leonard about retirement. Although the exact nature of these conversations is not clear, Leonard has put forth some evidence to suggest that Bert Turner's inquiries were unfriendly and that Turner was biased against him. In contrast to the employer in *Woythal,* who made only a few inquiries in response to rumors that Woythal had spread about his own retirement, Leonard contends that Bert Turner questioned him about retirement at least once a week even though he consistently asserted that he planned to work until he was 75. In addition, Leonard has alleged that Bert Turner did more than make inquiries. In contrast to Woythal's employer who never suggested that he retire, Turner allegedly suggested that Leonard "start thinking about retirement" and repeatedly recommended that Leonard retire at the age of 70.

Furthermore, although it is true that Leonard initially believed that Turner was just making friendly conversation when he asked him about retirement, this fact does not necessarily render Turner's comments irrelevant. While Leonard's earlier impression may cast some light on the tone of Turner's inquiries, it does not prove that Turner did not have a discriminatory motivation. It is possible that Turner initially befriend Leonard in order to convince him to retire and when that didn't work, moved on to more drastic means. The fact that Turner acted like a friend, and that Leonard initially believed that he was one, does not prove that Turner's actions were not motivated by an age-related bias. Viewed

in the light most favorable to Leonard (the nonmoving party), the evidence of Bert Turner's repeated inquiries and suggestions might be sufficient to allow a rational jury to conclude that Turner harbored some age-related bias against the Appellant.

### 2. Turner's Impact on Leonard's Termination

 However, in order to survive a motion for summary judgment, a plaintiff must do more than prove that another employee was biased against him. He must also provide sufficient evidence that would allow a rational jury to conclude that the decision to fire him was based on a discriminatory animus. *See Hicks*, 509 U.S. at 519, 113 S.Ct. 2742. In order to do this, the plaintiff must show some connection between the evidence of discriminatory animus and the adverse employment decision. While, the plaintiff is not required to show that the person who made the age-related comments was solely responsible for the adverse employment decision, the plaintiff must demonstrate that the speaker influenced the decision. *Ercegovich*, 154 F.3d at 354–55.[4]

 Leonard argues that Turner's comments give rise to an inference of discrimination because Bert Turner conducted the investigation that Susan McConn

relied upon when she made the decision to fire him. Despite these allegations, John Leonard has not provided material evidence that Bert Turner's investigation influenced Susan McConn's decision to fire him.

According to McConn, her decision to terminate Leonard's employment was based on Rose Hogue and Sam Mahan's allegations that Leonard had used racial slurs and the fact that Leonard used the term "black bastard" in the June 3 meeting. (J.A. at 95.) Plaintiff has not put forth any evidence to suggest that Bert Turner influenced these crucial facts in any way. Leonard does not allege that Bert Turner did anything to encourage Rose Hogue and Sam Mahan to make allegations against him. He does not even allege that Bert Turner was responsible for uncovering the allegations against him. In fact, it is undisputed that Rose Hogue and Sam Mahan's allegations came to light while Bert Turner was on sick leave. Furthermore, Leonard does not deny that he told Susan McConn and Bert Turner that he might have called Bill Parker a "black bastard." Thus, even assuming that Bert Turner harbored a bias against John Leonard, plaintiff has not provided sufficient evidence to support a finding that Turner influenced the facts that Susan

---

4. In *Ercegovich*, this Court held that "[a]lthough we believe a direct nexus between the allegedly discriminatory remarks and the challenged employment action affects the remark's probative value, the absence of a direct nexus does not necessarily render a discriminatory remark irrelevant." 154 F.3d at 355 (citing *LaPointe v. United Auto Workers Local 600*, 8 F.3d 376, 380 (6th Cir.1993)). The *Ercegovich* panel explicitly held that "remarks made by those who did not independently have the authority or did not directly exercise their authority to fire the plaintiff, but who nevertheless played a meaningful role in the decision to terminate the plaintiff, [are] relevant." *Id.* (citing *Wells v. New Cherokee Corporation*, 58 F.3d 233, 237–38 (6th Cir.1995); *Kelley v. Airborne Freight Corp.*, 140 F.3d 335, 347–48 (1st Cir.1998) (statement by head of human resources who "participated closely" in plaintiff's termination was admissible to show a discriminatory atmosphere); *Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1214 (3d Cir.1995) (age-related statements of corporate vice president who may have "played a role" in the decision to terminate the plaintiff were relevant and could "properly be used to build a circumstantial case of discrimination")).

McConn relied on when she decided to fire him.

### 3. The Decision–Making Process

 Leonard also argues that the decision-making process that led to his termination was so inadequate that it suggests that the allegations against him were a pretext for age discrimination. Leonard offers several facts in an attempt to support his claim. First, Leonard points out that Twin Towers did not question any of his coworker friends or allow him to bring witnesses to testify on his behalf. Second, Leonard notes that he was not given the opportunity to confront the employees who made allegations against him. Third, Leonard observes that Turner and McConn failed to look at Mary Bennett's notes, which he argues contradict Rose Hogue's testimony regarding the reason why he allegedly used a racial slur against Mary Bennett. Finally, Leonard asserts that his statement that he might have called Bill Parker a "black bastard" should not have been used to support a finding that John Leonard used racial language because Bill Parker is white. He contends that Susan McConn's reliance on this statement in her decision to fire him was "plainly preposterous" and indicates that the decision-making process was inadequate. (Appellant's Br. at 27.) He concludes that this evidence of pretext is sufficient to allow a rational jury to find that the decision to fire him was based on discriminatory animus.

 Leonard's allegations do not provide sufficient evidence for a reasonable jury to conclude that Twin Towers intentionally discriminated against him. In *Smith v. Chrysler*, 155 F.3d 799 (6th Cir. 1998), this Court held that the employer's proffered nondiscriminatory basis for its adverse employment action cannot be a pretext for discrimination if it is "honestly held." In that case, we noted that honest belief does not "require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse action." *Smith*, 155 F.3d at 807. If the employee produces sufficient evidence to establish that his employer failed to make a reasonably informed and considered decision, then the decisional process is "unworthy of credence" and the employer's reliance on it cannot be said to be "honestly held."

Plaintiff has not put forth material evidence to prove that Susan McConn did not honestly believe that Leonard used a racial slur against Mary Bennett. While it is true that Twin Towers only interviewed one of Leonard's coworkers in the maintenance department and refused to allow Leonard to bring his own witnesses, these facts do not suggest that Susan McConn's decisional process was "unworthy of credence." Although these coworkers might have testified that they had never heard Leonard use a racial slur, none of them could have refuted Mary Hogue's allegations because she was the only one present when John Leonard allegedly used a racial slur against Mary Bennett.

Similarly, the fact that Turner and McConn did not allow Leonard an opportunity to confront his accusers does not indicate that Twin Towers' decision-making process was inadequate. Leonard was informed of the charges against him and was given an opportunity to respond to these allegations. Twin Towers has the right to protect the employees who made allegations against Leonard. The Company's failure to provide Leonard with the same protections that our criminal justice system provides defendants does not support a finding of pretext.

In addition, Turner and McConn's decision not to interview Mary Bennett and not to look at her notes is not material evidence of discrimination. Turner explained that Mary Bennett was not consulted because she had been the target of Leonard's comments and was likely to be biased against him. While we must draw all inferences in favor of John Leonard, the failure to check Mary Bennett's notes does not suggest discriminatory animus. Leonard has offered no evidence to imply that Turner or McConn knew or could have known that these notes contained any contradiction. Furthermore, it is undisputed that Turner interviewed Mary Hogue twice in order to test the internal consistency of her statements.

Finally, Susan McConn's conclusion Leonard's "black bastard" comment supported a finding that he used a racial slur against Mary Bennett does not support a finding of discrimination. While Susan McConn admitted that the term "black bastard" may not have been a racial slur when used against Bill Parker, she no doubt recognized that the term has generally been used to disparage African–Americans. She found that the ease with which John Leonard used these words suggested that he was capable of using the word "nigger" in reference to Mary Bennett. This conclusion is not so unreasonable as to suggest that Susan McConn's beliefs were not "honestly held" and to imply that the decision to fire Leonard was motivated by age discrimination.

### IV. STATE CLAIMS

In addition to his ADEA discrimination claim, Leonard also brings suit under Ohio's age discrimination laws. OHIO REV. CODE ANN. § 4101.17 recodified as § 4112.14 (Anderson 1998). Under Ohio law the elements and burden of proof in a state age discrimination claim parallel the ADEA analysis. See *Ercegovich*, 154 F.3d at 357–58 (citing *McLaurin v. Fischer*, 768 F.2d 98, 105 (6th Cir.1985)). We therefore apply the foregoing analysis to Leonard's state law claims.

### V. CONCLUSION

Viewing all of this evidence together and in the light most favorable to the Appellant, we conclude that John Leonard has not offered sufficient evidence to allow a reasonable jury to find that Twin Towers discriminated against him in violation of either the ADEA or Ohio law. *See Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160, 1166 (6th Cir.1996) ("it was the trial court's duty to review all of the facts together, not in isolation"). Accordingly, we AFFIRM the Magistrate Judge's order granting summary judgement to Twin Towers.