# IN THE COURT OF APPEALS OF IOWA

No. 23-0628
Filed July 24, 2024

**DARRELL JEFFREY MCCLURE,**
  Plaintiff-Appellant,

**vs.**

**CORTEVA AGRISCIENCE LLC,**
  Defendant-Appellee.
_____

Appeal from the Iowa District Court for Keokuk County, Crystal S. Cronk, Judge.

An employee appeals the district court's grant of summary judgment in a discrimination case. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Michael J. Carroll of Carney & Appleby, P.L.C., Des Moines and Megan Flynn of Flynn Law Firm, P.L.C., West Des Moines, for appellant.

Susan P. Elgin of Faegre Drinker Biddle & Reath, LLP, Des Moines, Terran C. Chambers (pro hac vice) of Faegre Drinker Biddle & Reath, LLP, Minneapolis, Minnesota, and Daniel J. Gomez (pro hac vice) of Corteva Agriscience LLC, Wilmington, Delaware, for appellee.

Heard by Ahlers, P.J., and Chicchelly and Buller, JJ.

**BULLER, Judge.**

Corteva Agriscience LLC (Corteva)[1] fired long-time employee Darrell Jeffrey "Jeff" McClure following his involvement in a two-forklift collision. McClure sued Corteva based on that discharge, alleging age-discrimination, disability-discrimination, retaliation, and hostile-work-environment claims under the Iowa Civil Rights Act (ICRA). *See* Iowa Code §§ 216.6; .11 (2020). Corteva moved for summary judgment on all claims, and the district court ruled in the company's favor. Viewing the facts in the light most favorable to McClure, we find genuine issues of material fact exist on his discrimination claims, reverse that part of the district court's judgment, and remand for further proceedings. We affirm on all other issues.

## I. Background Facts and Proceedings

Fifty-eight-year-old McClure worked at Corteva for more than three decades—starting in 1983 and ending in 2020. Corteva is an agriculture company, and McClure held various roles over the years, ending his career as a production technician at a shipping and processing facility. In that role, McClure used a forklift and "other material handling devices" to transport Corteva's products around the facility, including to and from trucks and trailers. McClure also worked as an emergency medical technician (EMT) for a county hospital and as a firefighter and later fire chief for a nearby town. And he spent occasional weekends helping with races at the Iowa Speedway.

---

[1] Corteva has gone through a variety of name changes during McClure's employment. We refer to it as Corteva for the sake of consistency.

While employed by Corteva, McClure received generally positive reviews and ratings. According to his direct supervisor, Chad Langstraat, "a lot of people looked up to [McClure] that were out on the floor" and he "wasn't a bad employee, by no means." Langstraat wrote in McClure's 2016 end-of-year employee evaluation that he did "a good job in the warehouse," communicated planning concerns and safety suggestions to leadership, and excelled at leading other employees through fire-extinguisher and cardiopulmonary resuscitation (better known as CPR) training. But that evaluation also documented concerns that McClure was failing to follow some safety protocols so he could save time. Langstraat also informed McClure: "You need to have the understanding that [Corteva] as a whole is changing, and we have to change with it."

McClure's disciplinary history began in 1993 when he accidentally discharged his personal firearm at work. He also had occasional verbal warnings or coaching sessions regarding his performance over the years. He received a written warning in 2010 for violating a safety policy by being on stacked pallets without fall protection equipment and another in 2011 for sleeping on the job. McClure signed these later warnings but contested their accuracy.

At McClure's location, Corteva had a seasonal schedule for employees that included working either an eight-hour or twelve-hour shift. Potential eight-hour shifts included 6:00 a.m. to 2:30 p.m. (first shift), 2:00 p.m. to 10:30 p.m. (second shift), or 10:00 p.m. to 6:30 a.m. (third shift). And potential twelve-hour shifts included 6:15 a.m. to 6:00 p.m. (dayshift) or 6:00 p.m. to 6:15 a.m. (nightshift). Employees would switch shifts seasonally. For most of McClure's time at Corteva, he worked the nightshift or third shift. But following a heart attack in 2014, McClure

provided Corteva with a doctor's note specifying he "should not be on nightshift" due to his condition, and Corteva accommodated the limitation.

In 2017, Langstraat informed McClure that his new team schedule would probably have him working overnights. McClure reminded Langstraat of his medical restriction, and Langstraat turned the issue over to facility manager Dan Dehrkoop. At first, Dehrkoop told supervisors that Corteva had no record of McClure's doctor's note. But, after finding the note "stuck to a few other papers in the file," Dehrkoop told McClure he needed to submit a new doctor's note and Corteva would need to grant him a new accommodation.

Around this time, Langstraat and another supervisor, Steven Brooks, issued McClure a written warning based on a list of accumulated issues, such as McClure using an improper loading procedure for boxes in 2016 and 2017 and using his phone on the production floor in 2017. McClure signed the warning, despite contesting it in part on the basis that he and other employees had not been informed of changes to the loading procedure and a manager had instructed him to use his phone to document safety concerns.

McClure submitted a new doctor's note a few days after the written warning, specifying he was unable to "work prolonged nightshift schedule[s]" permanently. Dehrkoop requested further clarification on McClure's restriction, asking for the exact times McClure could not work. McClure obtained a second doctor's note, now specifying he could not work from 7:00 p.m. to 6:00 a.m. But Dehrkoop requested more clarification, so McClure got a third doctor's note detailing that he could "work an occasional nightshift" but no more than two and never back-to-back

because it could "severely disrupt his sleep cycle, which would adversely [a]ffect his overall medical condition."

Amid this doctor's-note debate, McClure filed a written grievance with Corteva. McClure wrote he felt discriminated against because of his age, years of service, and heart condition, and he relayed his issues with the shift restriction and recent written warning. He also chronicled other incidents that he alleged were mistreatment from supervisors against other employees. McClure updated the complaint a few days later, noting a recent exchange with Dehrkoop about the nightshift where Dehrkoop questioned "why should [Corteva] adhere to this work restriction when you're a volunteer fire fighter with overnight fires."

Corteva corporate human resource (HR) managers investigated McClure's complaint, along with another complaint from a different employee alleging similar concerns. After conducting interviews, the corporate HR managers determined McClure's discrimination complaints were unsubstantiated in January 2018. At some point, both Langstraat and Dehrkoop were shown McClure's complaint by another employee.

Corteva granted McClure his requested shift accommodation that same month, after McClure provided a fourth doctor's note. In the interim period between the request and approval of the accommodation, the company did not require McClure to work consecutive nightshifts.

Langstraat rated McClure as "below required performance" in his 2017 year-end evaluation. And Langstraat informed McClure he received this rating because of his written warning, despite McClure receiving "on track" scores otherwise. At the end of 2018, McClure returned to a "successful performance" rating, with

Langstraat noting McClure "made a change with his attitudes and behaviors this year and it has been noticed." During this time, McClure also received some instruction from supervisors on keeping his distance from running forklifts.

McClure had another heart attack in April 2019 and took short-term disability leave for fifty-four days. Dehrkoop questioned the length of McClure's leave, telling the facility's local HR manager that "it has to be close to long term disability." Dehrkoop also asked his local HR manager if there was anything that could be done to end McClure's leave because he heard McClure speak at a recent city council meeting and other employees informed him McClure had been seen working as fire chief and volunteering at the speedway. The local HR manager contacted corporate HR, leading to an "alert" on McClure's chart to inform corporate HR if McClure requested to extend his disability leave—which he did not. Corporate HR later confirmed that McClure was not "acting in violation of whatever restrictions his doctor had him on."

After McClure returned to work with a physician's release specifying no restrictions, Dehrkoop again sought to place him on the nightshift. Dehrkoop's local HR manager contacted corporate HR to see if McClure's previous restrictions were still in place. During that conversation, the local HR manager noted she and corporate had previous conversations about facility "employees who have nightshift restrictions" and "getting those to the forefront again." Corporate HR contacted McClure's doctor, then informed Dehrkoop and his HR manager that McClure's shift restriction was still in place.

Langstraat gave McClure another "successful performance" rating in his 2019 year-end review, noting McClure "continue[d] to do a good job with his safety

program and is willing to share his knowledge with others at work." But Langstraat also "challenge[d]" McClure to ensure he was "following all policies and procedures while driving a forklift" because Langstraat felt McClure "along with just about every other operator who drives a forklift" did not abide by some policies. Langstraat cautioned McClure about his "behaviors and actions while driving a forklift," noting new forklifts included sensors that tracked employee driving, and the sensors suggested McClure had a "high impact sensor rate" one month that year.

McClure claims these new sensors were unreliable because they inconsistently detected collisions. Other employees supported these claims, discussing how different forklifts responded differently to the same driving conditions. These employees relayed instances where a forklift's impact sensors went off despite no collision, registered a low-impact collision as a high-impact collision, or gave inaccurate information on driving speed. They also noted that supervisors, including Dehrkoop, were aware of the sensors' unreliability.

In April 2020, McClure self-reported an issue with one of the facility's loading docks to Corteva's safety supervisor. McClure entered a semi-trailer to load heavy equipment and the trailer pulled away from the loading dock with him and the loading equipment still inside. Corteva's policy was that semi drivers should not be given their keys until all equipment was loaded and that semitrucks should be locked into the docks. McClure informed the safety supervisor that another, younger employee had given the semi-driver the keys early and the dock had malfunctioned to falsely signal it was locked. McClure knew the docks had a history of malfunctioning, and another employee confirmed "sometimes [the signal lights] don't even work" and this issue was known to supervisors.

The safety supervisor and Brooks issued McClure a "final written warning" for the loading dock incident. They informed McClure his account did "not match the evidence" because maintenance could not replicate the malfunction and "multiple witnesses" saw the dock had correctly signaled it was unlocked. McClure disagreed with the findings and refused to sign the warning. The safety supervisor and Books did not issue a written warning to the younger employee who gave the semi-driver the keys but did "discuss and document" the issue with the employee.

A couple of weeks later, Brooks called McClure into his office to discuss issues with McClure calling in late in 2019 and 2020 and using "unplanned" paid time off. McClure began suffering from migraines after his 2019 heart attack and claims he informed Brooks those migraines contributed to his lateness. According to McClure, Brooks responded "Well I really doubt that. I think you're just trying to sleep in." Dehrkoop also met with McClure about his attendance and told him, "I want to ensure you understand, with any future performance or attendance violations, your job is in jeopardy."

That June, McClure was operating a forklift when he and another forklift operator collided. Both forklifts were driving in reverse before the collision. According to McClure, he stopped his forklift but the other operator kept going at a fast speed and hit him, while Corteva contends McClure backed directly into the other forklift. Both forklifts had sensors and the data from those sensors revealed the other operator was driving faster than McClure.

Following the collision, Dehrkoop emailed his local HR manager about McClure: "I think we are unfortunately ready for termination here." Dehrkoop acknowledged McClure had improved on his attendance but noted his continuing

forklift safety issues and ultimately fired him in July. The other forklift operator involved in the collision was a temporary employee, younger than McClure, and was not disabled "to the best of [McClure's] knowledge." The temporary employee was not disciplined by Corteva.

McClure sued Corteva in August 2021, alleging age discrimination, disability discrimination, retaliation, and workplace harassment. Before trial, McClure collected the depositions, declarations, and letters of past and present Corteva employees detailing their experiences with alleged discrimination. One former employee was sixty-one years old and had diabetes; he resigned in 2021 following a similar doctor's-note issue with Dehrkoop and reported he received unwarranted discipline and surveillance from Dehrkoop and other supervisors. Current employees included a thirty-year-old employee with narcolepsy who recounted that management called her "unreliable" because of her disability and that she had to resubmit her disability paperwork at the request of Dehrkoop, as well as sixty-three-year-old and sixty-six-year-old employees who relayed generally similar instances of unwarranted discipline, surveillance, and documentation.

As trial approached, Corteva moved for summary judgment on all claims. Finding no genuine issues of material fact, the district court granted Corteva's motion. McClure appeals.

## II.    Standard of Review

"Summary judgment is appropriate only when the record shows no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Hedlund v. State*, 930 N.W.2d 707, 715 (Iowa 2019). We view the entire

record in the "light most favorable to the nonmoving party." *Id.* And in doing so, we indulge in every legitimate inference that can be reasonably drawn. *Id.* But we do not weigh evidence or make credibility determinations. *Carr v. Bankers Tr. Co.*, 546 N.W.2d 901, 905 (Iowa 1996). "Mere skepticism of a plaintiff's claim is not a sufficient reason to prevent a jury from hearing the merits of a case." *Clinkscales v. Nelson Sec., Inc.*, 697 N.W.2d 836, 841 (Iowa 2005). Still, this is "the put up or shut up moment in a lawsuit, when a [nonmoving] party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Slaughter v. Des Moines Univ. Coll. of Osteopathic Med.*, 925 N.W.2d 793, 808 (Iowa 2019) (citation omitted).

### III. Discussion

We construe the ICRA's provisions broadly. Iowa Code § 216.18(1). While not bound by federal statutes or case law in our analysis, we look to these counterparts for assistance in enforcing the ICRA's "general proscription against discrimination." *Casey's Gen. Stores, Inc. v. Blackford*, 661 N.W.2d 515, 519 (Iowa 2003); *see Feeback v. Swift Pork Co.*, 988 N.W.2d 340, 347–48 (Iowa 2023).

### A. Discrimination

Under the ICRA, it's "an unfair or discriminatory practice" for an employer to discharge an employee "because of the[ir] age, race, creed, color, sex, sexual orientation, gender identity, national origin, religion, or disability." Iowa Code § 216.6(1)(a). At summary judgment, when discrimination claims rely on indirect evidence, courts employ a modified three-step burden-shifting analysis originating from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). *See Feeback*, 988 N.W.2d at 347. First, the employee establishes a prima facie case

of employment discrimination by showing an inference that he suffered an adverse employment decision based on a protected characteristic—here age or disability. *See id.* Second, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for its employment action." *Id.* (cleaned up). And last, the burden shifts back to the employee to show the employer's "proffered reason [was] pretextual or, while true, was not the only reason for [the adverse action] and that his [protected characteristic] was another motivating factor." *Id.* at 348.

The district court found McClure failed to make a prima facie case under either age or disability discrimination. Corteva defends the district court order but also notes we could affirm the summary-judgment ruling based on step three of the *Feeback* framework. *See Pitts v. Farm Bureau Life Ins. Co.*, 818 N.W.2d 91, 97 (Iowa 2012) (noting an appellate court may affirm on grounds raised but not decided below). While urging that both of his discrimination claims survive steps one and three, McClure concedes Corteva met its burden to proffer a legitimate reason for firing him under step two: he was an alleged safety risk.

### 1. Prima Facie Case of Age Discrimination

To establish a prima facie case of ICRA age discrimination, McClure had to show he possessed a protected characteristic, was qualified for his position, "and the circumstances of [his] discharge raised an inference of discrimination." *Feeback*, 988 N.W.2d at 347. Corteva concedes McClure met the first and third factors. But the district court found McClure failed the second—that he was qualified for his position.

The federal courts have noted state and federal precedent is not especially clear on what makes a person "qualified." *See Gardner v. Wal-Mart Stores, Inc.*,

2 F.4th 745, 748 n.3 (8th Cir. 2021) (noting conflicting definitions); *Garang v. Smithfield Farmland Corp.*, 439 F. Supp. 3d 1073, 1085–87 (N.D. Iowa 2020) (describing "two ostensibly-incompatible articulations"). One line of cases ties this element to an employer's expectations and whether the employee was performing "satisfactorily." *Farmland Foods, Inc. v. Dubuque Hum. Rts. Comm'n*, 672 N.W.2d 733, 742 n.1 (Iowa 2003) (race discrimination); *see Avery v. Iowa Dep't of Hum. Servs.*, 995 N.W.2d 308, 312 (Iowa Ct. App. 2023) (sex and sexual orientation); *Johnson v. Mental Health Inst.*, No. 16-1447, 2018 WL 351601, at *6 (Iowa Ct. App. Jan. 10, 2018) (explaining this approach in a racial discrimination claim). Another line ties it to the employee's qualifications and whether they can "perform the essential functions of the job" either with or without accommodation. *Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 14–17 (Iowa 2014) (disability); *Wing v. Iowa Lutheran Hosp.*, 426 N.W.2d 175, 179 (Iowa Ct. App. 1988) (age).

We conclude McClure generated a fact question under either articulation. Corteva contends McClure's documented safety history and data from the forklift sensor prove he was unqualified. But McClure notes he contested the safety violations and that other employees reported the forklift sensors were unreliable. *See Wyngarden v. State Jud. Branch*, No. 13–0863, 2014 WL 4230192, at *12 (Iowa Ct. App. Aug. 27, 2014) ("The disagreement among the parties concerning [the employee]'s work performance is a factual dispute precluding summary judgment."). He also points to employee evaluations and statements by supervisors, which were generally positive despite his written warnings and discipline. *See id.* While we acknowledge Corteva's proffered reasons concerning

safety violations, we think they best fit under steps two and three of the analysis—not the first. We find the facts here, particularly considering McClure's decades of continued employment, established a prima facie case of age discrimination. *See Caraballo-Caraballo v. Corr. Admin.*, 892 F.3d 53, 60 (1st Cir. 2018) ("[T]he employer has already expressed a belief that [the employee] is minimally qualified, by previously hiring [them]." (citations and internal quotations omitted)), *abrogated on other grounds by Muldrow v. City of St. Louis*, 601 U.S. ___, 144 S. Ct. 967 (2024). The district court erred in concluding otherwise.

### 2. Prima Facie Case of Disability Discrimination

For a prima facie case of ICRA disability discrimination, McClure had to show he had a disability, was qualified, and his discharge raised an inference of discrimination. *See Goodpaster*, 849 N.W.2d at 6, 10 (noting that, unlike federal law's scattered statutory provisions, "Iowa has one unified statute"). By statute, disability includes "the physical or mental condition of a person which constitutes a substantial disability." Iowa Code § 216.2(5). A substantial disability meaningfully restricts "one or more major life activities," including "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *See* Iowa Admin. Code r. 161-8.26(1), (3); *Goodpaster*, 849 N.W.2d at 13 n.4 (noting "the ability to work is something of a disability discrimination catchall"). A disability can also be substantial if a person "has a record of such an impairment" or is perceived by others "as having such an impairment." Iowa Admin. Code r. 161-8.26(1).

McClure argues he has a disability or was perceived as having a disability based on his limitation to working daytime hours. The district court disagreed: "the

record shows very little to suggest that once [McClure] was moved to day shift that his heart condition had any impact upon his ability to do his work." Corteva solely relies on the district court's reasoning on appeal. But as we have noted in an unpublished decision, that an employee "could perform the essential functions of his job . . . with some accommodation speaks to whether he was qualified for his position, not whether he was substantially impaired." *Vetter v. State*, No. 16-0208, 2017 WL 2181191, at *6 (Iowa Ct. App. May 17, 2017).

It's undisputed that McClure had two heart attacks over the course of his employment with Corteva. And McClure presented multiple doctor's notes showing how his first heart attack affected his health and required a permanently consistent "sleep cycle" to avoid further adverse health impacts. *See Katz v. City Metal Co.*, 87 F.3d 26, 31 (1st Cir. 1996) (concluding a heart attack could be a physical impairment). His second heart attack reinforced the ongoing nature of his impairment and meaningfully limited his ability to work swing shifts like other product technicians: he could not consistently work two of Corteva's three potential eight-hour shifts or the twelve-hour night shift. *Cf. Gile v. United Airlines, Inc.*, 213 F.3d 365, 373 (7th Cir. 2000) (discussing shift accommodation for employee with anxiety and insomnia). Nor could McClure have his schedule changed like others because of his accommodation—a fact which mattered to management. *See Vetter*, 2017 WL 2181191, at *4–6 (discussing the permanency and duration of the employee's impairment and that it limited his ability to work as compared to others in "manner and duration").

Corteva invites us to weigh evidence and question the credibility of McClure's restriction based on his EMT work and fire chief duties along with his

volunteer work at the speedway. But determining credibility and weighing evidence is for juries, not judges deciding motions for summary judgment. *See Carr*, 546 N.W.2d at 905. In line with the ICRA's broad construction, we find McClure generated a disputed issue of material fact as to whether he was disabled sufficient to defeat summary judgment on the first element of his prima facie case. *See* Iowa Code § 216.18(1); *see also Smidt v. Porter*, 695 N.W.2d 9, 14–15 (Iowa 2005) (detailing how the prima facie case "is a minimal requirement" (citation omitted)).

### 3.    Pretext and/or Motivating Factor

Finding McClure proved or at least generated a fact question on his prima facie cases of age and disability discrimination, and because step two is undisputed, we move to step three. McClure must "demonstrate the employer's proffered reason [was] pretextual or, while true, was not the only reason for his [discharge] and that his age [or disability] was another motivating factor." *Feeback*, 988 N.W.2d at 348. At oral argument, McClure clarified that he was pursuing both a pretext theory and a motivating-factor theory. And Corteva agreed both theories were at play. Despite the avenue taken (pretext, motivating factor, or both), the bottom-line question under the *Feeback* framework is the same: whether there is a genuine issue of material fact that the employee's protected characteristic played a part in the adverse employment action. *See DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1, 13 (Iowa 2009) (noting a motivating factor is one that "played a part" in the adverse employment action); *Boge v. Deere & Co.*, No. 22-CV-2074-CJW-KEM, 2024 WL 690234, at *17 (N.D. Iowa Feb. 20, 2024) (examining *Feeback*'s modified test).

Discrimination claims that advance to step three of the *Feeback* framework are tough to square with summary judgment because the focus is on discerning discriminatory animus from the evidence. *See Hoefer v. Wis. Educ. Ass'n Ins. Tr.*, 470 N.W.2d 336, 338 (Iowa 1991) (en banc) (noting civil claims dealing with motive and intent "are generally poor candidates for summary judgment because of the[ir] subjective nature"). The often-elusive nature of this animus means employees usually piece together circumstantial evidence to create a "mosaic of intentional discrimination" at this stage. *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 259 (2d Cir. 2023) (citation omitted). Still, employees "must set forth specific facts showing that there is a genuine issue for trial." Iowa R. Civ. P. 1.981(5). In reviewing the evidence put forward by McClure, we analyze his age and disability claims largely in tandem.

McClure offered a variety of evidence to prove that his age, disability, or both played a part in Corteva's decision to fire him. He first points to the declarations and depositions of former and current Corteva employees who claim to have also experienced age or disability discrimination at the hands of supervisors using allegedly similar unwarranted discipline, documentation, and scrutiny. McClure then directs us to the two younger, nondisabled employees who were part of the 2020 docking incident and forklift collision and notes they were not fired. Finally, McClure highlights remarks by Dehrkoop and others over the years questioning his restrictions and disability.

The district court did not have the benefit of the *Feeback* framework when ruling on whether this evidence was sufficient to survive summary judgment. Instead, the court analyzed whether McClure's age (but not his disability) played a

part in his 2020 discharge under McClure's prima facie case. In doing so, the court ruled that McClure's age was not a motivating factor because it found the depositions, declarations, and letters from current and former Corteva employees were "not the sort of competent evidence to defeat a motion for summary judgment." The court further found the younger Corteva employees involved in both of McClure's 2020 incidents were "poor examples" because they had different disciplinary histories from McClure and the temporary employee was "only under [Corteva]'s control in a limited capacity." We disagree.

First, the discriminatory experiences of other employees can help determine an employer's animus depending on "how closely related the evidence is to the [employee]'s circumstances and theory of the case" among other factors. *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008). Here, McClure provided evidence showing Dehrkoop and other supervisors scrutinized the accommodations of other disabled employees in similar or identical ways, including through requests to resubmit their paperwork, challenging doctor's notes, and verbally doubting the impact their disabilities had on their punctuality and attendance. *See Valdez v. W. Des Moines Cmty. Schs.*, 992 N.W.2d 613, 640 (Iowa 2023) (noting the relevance of analogous evidence, even though its admission at trial is subject to the court's discretion). Similarly, McClure put forward evidence that multiple former and current employees around his age experienced comparable allegedly unwarranted written warnings and monitoring by management based on minor safety violations or unreliable forklift sensor data. *See id.* In sum, we find the evidence of Corteva's "discriminatory atmosphere" competent to survive summary judgment. *See Hamer v. Iowa C.R. Comm'n*, 472

N.W.2d 259, 262–63 (Iowa 1991) (discussing prior-acts evidence in a similar context); *Cap. One Bank (USA), N.A. v. Taylor*, No. 13-2043, 2015 WL 7567398, at *6 (Iowa Ct. App. Nov. 25, 2015) (finding an affidavit competent—though not the strongest—evidence).

Second, while we employ a "rigorous" test to determine whether two employees are so similarly situated that the disparate treatment they faced is a useful comparison, we do not require doppelgängers. *Feeback*, 988 N.W.2d at 350. McClure must show that "he 'was treated differently than other employees whose violations were of comparable seriousness.'" *Id.* (emphasis and citation omitted). And he put forward evidence on this question, pointing to the two younger, nondisabled employees who were doing the same job as him and committed some of the same infractions but were not disciplined or fired. While one of those employees was a temporary worker, a Corteva supervisor acknowledged the company could have disciplined or functionally discharged the employee and did not do so. Despite these younger employees committing some of the same violations as McClure, Corteva contends they are not useful comparators because of McClure's disciplinary history. But this argument takes a wrong turn; the extent and accuracy of McClure's safety record and discipline is itself a factual dispute here, which we are not empowered to resolve at summary judgment. *See George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) (finding employees similarly situated for summary judgment despite plaintiff's contested workplace violations). Thus, we find the disciplinary history between McClure and the two younger, nondisabled employees was not so disparate as to bar them as useful comparators. *See Wyngarden*, 2014 WL 4230192, at *9–10; *Coleman v.*

*Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) ("So long as the distinctions between the plaintiff and the proposed comparators are not 'so significant that they render the comparison effectively useless,' the similarly-situated requirement is satisfied." (citation omitted)).

Third, independent of the comparator evidence, McClure also put forward evidence of management's repeated inquiry into his shift restriction and doctor's notes. *See Palmer Coll. of Chiropractic v. Davenport C.R. Comm'n*, 850 N.W.2d326, 333 (Iowa 2014) (noting the prohibition on disability discrimination includes "discrimination based on thoughtlessness, apathy, or stereotype"). Much of this scrutiny came from Dehrkoop who, over the years, repeatedly questioned and commented on the perceived veracity of McClure's shift restriction, complained about how long McClure took off after his second heart attack, and sought opportunities to end his accommodation. *See Leonard v. Twin Towers*, 6 F. App'x 223, 230 (6th Cir. 2001) ("[W]e must carefully examine the nature of the inquiries and the context in which that inquiry was made."); *Ryder v. Westinghouse Elec. Corp.,* 128 F.3d 128, 132–33 (3d Cir. 1997) (acknowledging comments by an executive can be circumstantial evidence of discrimination). McClure's evidence at this stage tended to corroborate that Dehrkoop targeted McClure's accommodation, with emails documenting questions about McClure's continuing restrictions, commenting on his outside activities while on short-term disability, and discussing shift accommodations more generally. *Cf. Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014) (finding vague comments on whether candidate "fit in" could create an inference of discrimination depending on the circumstances). While these remarks and inquiries may not be "sufficient on their

own," *Hedlund*, 930 N.W.2d at 721, they provide circumstantial evidence that points toward intentional discrimination when combined with other evidence. *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) (concluding "remarks can no longer be deemed 'stray'" when "other indicia of discrimination are properly presented").

Corteva last points to Iowa's recently adopted "honest belief rule." Under this rule, McClure must provide evidence that Corteva did not in good faith reasonably believe McClure's continued employment was a safety risk. *See Feeback*, 988 N.W.2d at 349–50. Naturally, the fact that an employer's belief is objectively false or unreasonable can provide evidence of its dishonesty depending on the circumstances. *DeJesus v. WP Co. LLC*, 841 F.3d 527, 534 (D.C. Cir. 2016) (observing that "honesty and reasonableness are linked"). But Corteva could still prevail, despite the factual disputes swirling around McClure's safety history, if it could demonstrate the absence of a similar dispute on whether management honestly and reasonably believed McClure was a safety risk. *See George*, 407 F.3d at 415. We conclude on this record Corteva cannot show the question is undisputed. Along with contesting his safety history, McClure provided evidence that could lead a rational jury to conclude Dehrkoop acknowledged McClure's improvement on certain performance issues right before firing him, Dehrkoop and other supervisors knew about the malfunctioning docks and unreliable forklift sensors, and this same forklift sensor data depicted McClure's forklift as going slower than the younger and nondisabled employee's at the time of collision—corroborating McClure's version of events. Given this evidence, we

find fact questions on Corteva's professed honest belief that McClure was a safety risk are appropriately left for a jury rather than summary judgment.

### B. Retaliation

Employers cannot retaliate against a person for opposing "any practice forbidden under" the ICRA or for filing a complaint, testifying, or assisting "in any proceeding" within the statute. Iowa Code § 216.11. To establish a retaliation claim at summary judgment, McClure had to show he participated in a protected activity, he was subject to an adverse employment action, and a causal connection existed between the two. *See Rumsey v. Woodgrain Millwork, Inc.*, 962 N.W.2d 9, 28 (Iowa 2021) (citation omitted). The district court found that McClure met the first and second step but not the third. Causation is shown if the protected activity was a motivating factor in the employer's adverse employment action. *Id.* at 32; *DeBoom*, 772 N.W.2d at 13.

McClure argues the district court erred in granting summary judgment on his retaliation claim because his 2017 complaint played a part in his 2020 discharge. In doing so, McClure points out another employee showed both Dehrkoop and Langstraat the complaint sometime after he filed it. And he highlights how Corteva supervisors' documentation of and discipline for (what McClure calls) frivolous safety violations "ramped up" in the years following.

A plaintiff must link their protected activity to an employer's adverse employment action to survive summary judgment. And we agree with the district court that McClure's proffered link is too attenuated. McClure filed his complaint more than two years before his discharge. Timing is not the be-all and end-all of causation, but McClure must provide something showing his complaint played a

part in his termination. *See Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 750 (Iowa 2006) (discussing timing "combined with all the other circumstances in the case"). He seeks to do so on a theory of increased unwarranted discipline and documentation following his complaint. But most of his written warnings pre-date the complaint, as did many of the supervisors' documented safety concerns with his forklift driving. While we found McClure has generated a fact question on whether much of the documentation and discipline was frivolous, without more no reasonable jury could find Corteva retaliated against him.

### C. Hostile Work Environment

For a hostile-work-environment claim, McClure had to show at summary judgment that he possessed a characteristic protected under the ICRA; he faced unwelcome harassment; that harassment stemmed from his protected characteristic; and the harassment affected a term, condition, or privilege of his employment. *Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 571 (Iowa 2017). Assuming Corteva's conduct was unwelcome harassment based on McClure's age or disability, the district court found McClure failed to meet the last element.

To prove workplace harassment affected employment, the effects of harassment must rise "to the level of a hostile work environment when the workplace is permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Valdez*, 992 N.W.2d at 631 (cleaned up) (citation omitted). In considering this objective standard, we weigh the conduct's frequency; its severity; whether it was physically threatening,

humiliating, or merely offensive; and whether it unreasonably interfered with job performance. *Farmland Foods*, 672 N.W.2d at 744–45. "These factors and circumstances must disclose that the conduct was severe enough to amount to an alteration of the terms or conditions of employment." *Id.* at 745.

McClure contends Corteva supervisors subjected him to unwelcome harassment based on his age and disability in three ways. First, "through unjustified discipline" that started in 2017 and carried on until his discharge. Second, by Dehrkoop's treatment of McClure's shift accommodation. And finally, through Corteva causing him to work "in an environment where employees were regularly being mistreated" in similar ways based on their ages or disabilities.

But even taking McClure's facts as true, we conclude a jury could not find this harassment threatening or humiliating. Most of the unwarranted discipline and mistreatment came from private written or oral communication. And McClure has not shown how the supervisors' harassment impacted his job performance after Dehrkoop granted his shift accommodation, as his employment reviews continued to rate his performance as successful other than the noted safety concerns. *See id.* (noting that hostile-work-environment "claims by their nature involve ongoing and repeated conduct, not isolated events"). Our supreme court also recently clarified the value of "secondhand reports" of harassment in hostile-work-environment claims, and McClure has not offered evidence he was aware of mistreatment involving employees beyond what he noted in his 2017 internal complaint. *See White v. State*, 5 N.W.3d 315, 328–29 (Iowa 2024) (finding secondhand reports "of relatively little value" in proving personal experience of

harassment); *Garang*, 439 F. Supp. 3d at 1089 (differentiating these claims from disparate-treatment claims).

**IV.     Disposition**

Finding fact questions remain on McClure's age- and disability-discrimination claims under the ICRA, we reverse the district court's grant of summary judgment as to those issues.  We affirm on all other claims.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**